No. 99,988

STATE OF KANSAS, *Appellee*, v. SCOTT D. CHEEVER, *Appellant*.

(284 P.3d 1007)

Opinion filed August 24, 2012.

*Debra J. Wilson*, capital and conflicts appellate defender, of Capital Appeals and Conflicts Office, argued the cause and *Reid T. Nelson*, capital and conflicts appellate defender, was with her on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Clay Britton*, assistant attorney general, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*: A jury convicted Scott D. Cheever of capital murder for the killing of Greenwood County Sheriff Matthew Samuels (K.S.A. 21-3439[a][5]), four counts of attempted capital murder of law enforcement officers Robert Keener, Travis Stoppel, Mike Mullins, and Tom Harm (K.S.A. 21-3439[a][5]; K.S.A. 21-3301[a]), criminal possession of a firearm based on a previous felony conviction for aggravated robbery (K.S.A. 21-4204[a][3]), and manufacture of methamphetamine (K.S.A. 65-4159[a]). Cheever was sentenced to death on the capital offense. In addition, he was given a controlling sentence of 737 months for the attempted capital murder convictions, which included concurrent sentences of 146 months for the manufacturing conviction and 8 months for the firearm conviction. Cheever filed a timely appeal of his convictions

and sentences. We have jurisdiction under K.S.A. 21-4627(a) ("A judgment of conviction resulting in a sentence of death shall be subject to automatic review by and appeal to the supreme court of Kansas.").

We conclude that allowing the State's psychiatric expert, Dr. Michael Welner, to testify based on his court-ordered mental examination of Cheever, when Cheever had not waived his privilege under the Fifth Amendment to the United States Constitution in that examination by presenting a mental disease or defect defense at trial, violated Cheever's privilege against compulsory self-incrimination secured by the Fifth and Fourteenth Amendments to the United States Constitution. Because we are unable to conclude beyond a reasonable doubt that Welner's testimony did not contribute to the capital murder and attempted capital murder verdicts obtained in this case, this constitutional error cannot be declared harmless. Consequently, Cheever's convictions for capital murder and attempted capital murder must be reversed and remanded for a new trial.

Cheever did not challenge his convictions and sentences for manufacture of methamphetamine and criminal possession of a firearm. We affirm those convictions and sentences.

## FACTS AND PROCEDURAL BACKGROUND

On January 19, 2005, Scott D. Cheever shot and killed Greenwood County Sheriff Matthew Samuels at Darrell and Belinda Coopers' residence near Hilltop, Kansas. Samuels, acting on a tip, had gone to the Coopers' residence, along with Deputy Michael Mullins and Detective Tom Harm, to attempt to serve an outstanding warrant for Cheever's arrest. Cheever, along with the Coopers, Matt Denney, and Billy Gene Nowell, had been cooking and ingesting methamphetamine in the early morning hours prior to Samuels' arrival. In the ensuing attempts to remove the wounded Samuels from the residence and arrest Cheever, Cheever also shot at Mullins, Harm, and two state highway patrol troopers, Robert Keener and Travis Stoppel.

At trial, the facts surrounding the shootings were recounted by several witnesses including the Coopers, the surviving law enforce-

ment officers, and by Cheever himself. There was little discrepancy in the pictures painted by the various accounts.

Shortly before Samuels, Mullins, and Harm arrived at the Coopers, Belinda had received a telephone call informing her that the police were on their way to the house to look for Cheever. Belinda told Cheever the police were coming and asked him to get his stuff together and leave, but Cheever's car had a flat tire.

When Samuels arrived at the Cooper's house, Cheever and Denny were hiding in an upstairs bedroom. Cheever had two guns with him—a .44 caliber Ruger revolver and a .22 caliber semi-automatic pistol. As he hid upstairs, Cheever heard the officers pull up to the house and heard Darrell yell that the cops were there and that he was going to tell them Cheever was not there. Cheever also heard Darrell answer the door and tell Samuels Cheever was not there. Cheever heard Darrell agree to allow Samuels inside to look around.

Cheever heard Samuels calling out his name as he looked for Cheever on the first floor. The doorway to the upstairs had a piece of carpet covering it and Samuels asked Belinda where the doorway led. Belinda said it went upstairs. Samuels pulled the carpet back and yelled for Cheever. Cheever looked over at Denny and told him, "Don't move, don't make a sound, just stay right where you are." Samuels then went through the doorway to go upstairs.

Cheever heard Samuels' steps on the stairs. Cheever had the loaded and cocked .44 in his hand when he stepped out of the bedroom and looked down the stairway. Cheever saw Samuels coming up the stairs. Cheever pointed his gun and shot Samuels. Cheever then stepped back into the bedroom and told Denny not to go out of the window because they would shoot him. Cheever returned to the stair railing, looked down the stairs, saw Samuels, and shot him again. Cheever stepped back into the bedroom and saw that Denny had left through the window. Cheever then shot at Mullins and Harm as they tried to get the wounded Samuels out of the stairwell. Later, he shot at Keener and Stoppel, who were part of the SWAT team that entered the house to arrest Cheever.

Cheever asserted a voluntary intoxication defense, based on the theory that methamphetamine use had rendered him incapable of

forming the necessary premeditation to support the murder and attempted murder charges. Cheever's evidence in support of his defense consisted of his own testimony and the testimony of his expert witness, Dr. Roswell Lee Evans, Jr., a doctor of pharmacy with a specialty in psychiatric pharmacy.

The jury found Cheever guilty on all counts as charged. At the penalty phase, the jury unanimously found beyond a reasonable doubt that the three alleged aggravating circumstances had been proven to exist and that they were not outweighed by any mitigating circumstances found to exist and therefore sentenced Cheever to death. The trial court subsequently accepted the jury's verdict and imposed a sentence of death.

While the facts of the case are relatively straightforward, the procedural history of the case is less so. The case was originally filed in Greenwood County District Court shortly after the crime. At about the same time, this court found the Kansas death penalty scheme unconstitutional in *State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd and remanded by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). The state proceeding was dismissed after federal authorities initiated prosecution in the United States District Court under the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.* (2006).

The federal case went to jury trial in September 2006, but 7 days into jury selection, the case was suspended when Cheever's defense counsel became unable to proceed. The federal case was subsequently dismissed without prejudice and the state case was refiled, went to trial, and resulted in the convictions and sentences before us in this appeal. Additional facts will be included in the discussion where relevant to the issues.

## I. Court-ordered Mental Examination

During the course of the federal proceedings, Judge Monte Belot ordered Cheever to undergo a psychiatric examination with Dr. Michael Welner, a forensic psychiatrist hired by the government. While the precise circumstances leading to Judge Belot's order are not in the record before us, the record is sufficient to show that the mental examination was ordered because Cheever had raised

the possibility that he would assert a defense based on mental condition. As a result of that order, Cheever submitted to examination by Welner. Welner's interview of Cheever lasted 5 and ½ hours, was videotaped, and resulted in a 230-page transcript.

Welner's examination first became an issue at trial during the State's cross-examination of Cheever. The State sought to use the transcript of Cheever's interview with Welner to impeach Cheever's testimony that he did not hear Samuels ask if he could go upstairs. Defense counsel objected, arguing that because the defense had not filed a notice of intent to rely on a mental disease or defect defense, the State was not entitled to use Welner's examination of Cheever. The trial court allowed the impeachment as "a prior inconsistent statement given to a witness who will testify" after the State confirmed Welner would be called as a rebuttal witness to Cheever's voluntary intoxication defense.

Cheever's expert witness in support of his voluntary intoxication defense was Dr. Roswell Lee Evans, Jr., a doctor of pharmacy, who specialized in psychiatric pharmacy, the pharmacological effects of drugs, including illegal drugs such as methamphetamine. Evans testified that methamphetamine is a very intense stimulant drug that has three pharmacological phases: the initial rush, the long-term intoxication, and the neurotoxic phase. Evans explained that the initial rush is a virtually instantaneous very extreme high that lasts approximately 30 minutes. Following the initial rush is the long-term intoxication period. He testified that the intoxication lasts about 13 to 14 hours, during which the user is still under the influence of the drug.

Evans testified that while methamphetamine is not pharmacologically addictive, the intense pleasure of the initial rush makes the drug psychologically addictive. Users seek that intense high and therefore, once that starts, they do not have much control over whether they continue to use the drug. However, methamphetamine users develop a tolerance to the initial rush, leading them to increase the frequency of use or the dosage, which then extends the long-term intoxication stage.

The neurotoxic phase, Evans testified, develops in chronic, long-term users. He said that the neurotoxic effect of long-term use can

change the structure of the brain, resulting in the loss of gray matter and consequential loss of brain function, including loss of cognitive functions that deal with planning, assessing consequences, abstract reasoning, and judgment. Evans testified that long-term use can cause paranoid psychosis which, due to impairment of the brain functions responsible for judgment and impulse control, can result in violence. According to Evans, chronic users in a state of paranoid psychosis begin to react—just like the natural reaction to touching a hot stove—to all sorts of stimuli based on their paranoid ideations. While Evans testified that neurotoxic changes could potentially be permanent, his testimony primarily indicated that these changes persist only as the result of continued drug use and would abate after a period of nonuse ranging from 4 to 6 months.

Testifying about Cheever specifically, Evans said that at the time of the crimes, Cheever's drug use had progressed to the point that he had developed neurotoxicity and was showing symptoms of psychosis, evidenced by doing "really stupid judgment kind of stuff." Evans noted that Cheever had progressed to the point where he had become so suspicious of people he was carrying a gun and was reacting to perceived threats that were not real.

Ultimately, Evans testified it was his opinion that at the time Cheever committed these crimes, Cheever was both under the influence of recent methamphetamine use and impaired by neurotoxicity due to long-term methamphetamine use, which affected his ability to plan, form intent, and premeditate the crime. With respect to shooting Samuels, Evans testified that there "was no judgment. There was no judgment at all. This man just did it."

On cross-examination, the State made clear that Evans was not a medical doctor, not a psychiatrist, not a neurologist, and not a psychologist. The State characterized Evans as a "pharmacist."

At the conclusion of Evans' testimony, the defense rested. The State then sought to present Welner as a rebuttal witness. Defense counsel objected, arguing that because Cheever had not asserted a mental disease or defect defense in this case, the State could not use Welner's examination. The State contended that Welner's testimony was proper rebuttal to Cheever's voluntary intoxication defense. Further, the State suggested that Welner's testimony was

proper rebuttal because Evans had testified he relied upon Welner's report. The trial court ruled that Welner's testimony was admissible as rebuttal to the voluntary intoxication defense.

Welner's testimony began with a long discourse on his qualifications, his substantial fee, and the extensive methodology he applies to cases under his review. Welner also described in detail the materials he reviewed prior to interviewing Cheever, the 5 and ½ hour interview process, and the psychological testing that was conducted on Cheever.

Welner testified that based on his examination, it was his opinion that on January 19, 2005, Cheever's perceptions and decision-making ability were not impaired by methamphetamine use. Welner told the jury that Cheever had the ability to control his actions, he had the ability to think the matter over before he shot Samuels, and he had the ability to form the intent to kill.

Addressing the relationship between Cheever's level of suspicion on the day of the crimes and his use of methamphetamine, Welner testified that while Cheever was suspicious that morning, his suspicions were reality based—given that Cheever was involved with several people in making illegal drugs and that he knew law enforcement officers were looking for him because he had violated parole. Welner testified that this demonstrated Cheever's suspicions were not irrational. Welner also concluded that there was no change in Cheever's level of suspicion after he used methamphetamine.

Addressing the relationship between Cheever's level of suspicion and violence, Welner testified that Cheever's conduct demonstrated that his suspicions were not a trigger for violence. He considered it significant that, although Cheever had suspicions about the others taking his manufacturing supplies or swindling him in some way, Cheever did not react with violence. Instead, Cheever attempted to gain control over the situation and defuse the perceived threats by giving Denny a walkie-talkie to monitor the area and personally engaging with Nowell, whom he did not trust. Welner testified that Cheever's reactions did not change after he used methamphetamine. Upon learning that the police were on their way, Cheever's response, "Well, I hope everyone is happy," was

consistent with his suspicion that everyone at the house was out to get his methamphetamine. Yet despite that suspicion, Cheever did not become hostile or react with threats or violence.

Welner also addressed whether Cheever had suffered any "longstanding-effects" or "brain damage" as a result of methamphetamine use. He noted that neuropsychological testing conducted by another doctor showed Cheever had high-average executive functioning and response inhibition. Welner testified that Cheever's thought processes and decisions on the day of Samuels' killing were consistent with that finding, demonstrating that Cheever's executive decision-making abilities were not impaired by methamphetamine. To support that conclusion, Welner went through each and every step of the events, describing what Cheever had perceived, every decision Cheever had made, and every resulting action of those decisions:

"Within that look at executive functioning, Dr. Price found that Mr. Cheever had high average what is known as response inhibition . . . . The reason that that is significant is that it is testing that looks at complex tasks of thinking and processing and also inhibiting response. And when I think about the decisions and processing that he was making all through that day, [']I'm suspicious of these people, I'm armed, this person is hostile to me, I'm giving him drugs without threat, I'm suspicious of this person, he is unarmed, I am armed, I don't threaten him, I'm not intimidating him,['] I'm talking about Matthew Denny. [']I hear police. I recognize the voice of this person as someone that I have had positive experiences with. I make a decision not to shoot, but to be silent, with the hope that this person goes away. The person comes near me but turns, and I'm aware of his movements, and still I am quiet and I don't shoot and I don't move. And I don't jump out the window the way my confederate later does. And when I do shoot, I don't shoot before Matthew Samuels walks through the curtain in such a way that I might scare him, the way my later shots frightened the deputies that came to pull him away, but I shoot him at a point in which he is very much within my range, has passed through that curtain, and I know that he is coming upstairs, and that is when I shoot. And then I stop shooting when someone says stop shooting. And then I continue not to shoot the entire day, not until I know that a SWAT team is making its way up and then I fire shots, and as soon as my bullets expire, I throw my hands up and say I surrender.['] And so this is a whole range of executive decision-making that reflects go, no go, act, don't act. And so it is— his history is consistent with what was found in Dr. Price's testing of, certainly, unimpaired, but what Dr. Price found was that he had high-average response inhibition to his cognitive functioning."

Focusing specifically on the shooting of Samuels, Welner described Cheever's decision-making process:

"The decision-making ability, as I've—as I've assessed it in this case, began with his—his decision-making once it became clear that the police were there. He made a decision not to try to flee, not to try to run. He made a decision to keep himself where he kept himself, as opposed to another part of the house. He made a decision to stay quiet lest any kind of disturbance aroused suspicion from Matthew Samuels downstairs. He made a decision to hold his fire when he did, even though he was armed. He made a decision to hold his fire even after Matthew Samuels approached the first time. And he made a decision to hold his fire even though he knew Matthew Samuels was outside and preparing to come back, that he did not shoot out the window or do anything of a provocative and intimidating way to say, 'Stay away, because I will shoot.' And he made a decision to shoot when he did.

"And then he engaged Matthew Denny and then went back and made a decision to shoot again. And then when he stopped shooting he made a decision to stop shooting."

Welner testified he considered and ultimately discounted other factors that could possibly explain Cheever's crimes, such as psychiatric conditions or disorders. He also considered and ultimately discounted environmental phenomena that could influence Cheever's efforts to avoid being taken into custody. Welner told the jury that Cheever identified with and looked up to people that he described as bad boys or outlaws and that he wanted to outdo them. Welner opined that, while it was possible methamphetamine made Cheever more aggressive, it did not affect "his decision to be an outlaw and to identify with outlaws and to make decisions as outlaws do."

Cheever argues that his Fifth Amendment privilege against compulsory self-incrimination was violated when the trial court allowed the State to use the court-ordered mental examination by Welner when Cheever had not waived his privilege in that examination by asserting a mental disease or defect defense at trial.

## A. *Preservation/Standard of Review*

The State argues that Cheever's constitutional challenge to the admission of evidence from the court-ordered examination was not properly preserved for review because he did not object on Fifth Amendment grounds at trial. See K.S.A. 60-404 (a timely and spe-

cific objection is required to preserve evidentiary issues for appeal); *State v. Richmond,* 289 Kan. 419, Syl. ¶ 4, 212 P.3d 165 (2009) ("A defendant cannot object to the introduction of evidence on one ground at trial and then assert another ground on appeal.").

Although Cheever disputes the State's contention that his objection was insufficient to preserve his constitutional claim, he argues alternatively that preservation is not fatal to his claim. In support, Cheever relies on the following language of K.S.A. 21-4627(b):

"[in a death penalty case] [t]he supreme court of Kansas shall consider the question of sentence as well as any errors asserted in the review and appeal and *shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby."* (Emphasis added.)

Cheever asserts that because Welner's testimony played a large role in the guilt and penalty phases, it serves the ends of justice to determine whether the use of that evidence violated his constitutional privilege against compelled self-incrimination.

We hold that lack of preservation is not an obstacle to our review, but not because of our authority to notice *unassigned* errors under K.S.A. 21-4627(b), as Cheever argues. K.S.A. 21-4627(b) provides two distinct exceptions in death penalty cases to general rules concerning appellate review: It requires the court to consider all errors asserted on appeal, and it authorizes the court to notice unassigned errors appearing in the record if doing so serves the ends of justice.

The first exception applies to errors raised by the parties. The statute mandates that we consider any errors the parties raise on appeal, whether preserved for review or not. *State v. Kleypas,* 272 Kan. 894, 952, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *abrogated on other grounds by Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006) (K.S.A. 21-4627[b] requires the court to consider the defendant's claims of prosecutorial misconduct "whether or not objected to at trial."). Thus, the statute imposes a mandatory exception in death penalty appeals to the various statutes and rules barring consideration of unpreserved issues. See, *e.g., State v. Bornholdt,* 261 Kan. 644, 651, 932 P.2d 964 (1997), *disapproved on other grounds by State v. Marsh,* 278

Kan. 520, 102 P.3d 445 (2004), *rev'd and remanded on other grounds by Kansas v. Marsh*, 548 U.S. 163 (2006) (construing identical language in K.S.A. 1993 Supp. 21-4627, which applied in hard 40 appeals, the court held the requirement that the court review any error asserted on appeal supersedes the contemporaneous objection rule of K.S.A. 60-404); *State v. Collier*, 259 Kan. 346, Syl. ¶ 1, 913 P.2d 597 (1996) (special review provision of K.S.A. 1993 Supp. 21-4627 requires court to "consider and reach" each issue raised on appeal, "even if the defendant fail[ed] to raise objections in the trial court").

The second exception applies to unassigned errors. An unassigned error is one *not* raised by the parties but noticed by the court on its own during its review of the record. *Cf. State v. Hayes*, 258 Kan. 629, 637, 908 P.2d 597 (1995) (because defendant did not receive a hard 40 sentence, the court would not search the record for unassigned errors under the special review provision of K.S.A. 1993 Supp. 21-4627). In contrast to our duty to consider all asserted errors, our review of unassigned errors is permissive and conditional. K.S.A. 21-4627(b) (The court "shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby.").

On this issue and throughout his brief, Cheever misses the distinction between these two provisions. Because Cheever raises the Fifth Amendment issue in his brief, it is not an unassigned error; it is an asserted error. Accordingly, we must review Cheever's constitutional claim, notwithstanding the State's contention that Cheever's failure to raise that specific ground at trial precludes appellate review.

Having determined that this issue is reviewable, we next address the standard of review. Because Cheever challenges the legal basis for the admission of this evidence, our standard of review is de novo. *State v. Appleby*, 289 Kan. 1017, 1054-1055, 221 P.3d 525 (2009) (claim that admission of evidence violated the Sixth Amendment's Confrontation Clause reviewed de novo); *State v. White*, 279 Kan. 326, 331-33, 109 P.3d 1199 (2005) (appellate court has unlimited review of claim that evidentiary ruling violated constitutional rights).

## B. *Analysis*

Cheever relies primarily on *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), *Buchanan v. Kentucky*, 483 U.S. 402, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987), and several related cases to argue that because he had not waived the privilege by presenting evidence of a mental disease or defect at trial, the State was precluded by the Fifth Amendment from using statements he made during Welner's examination, conducted as part of the federal case, against him. The State responds that its use of Welner's examination was proper rebuttal and impeachment.

In *Smith*, the United States Supreme Court held that a court-ordered pretrial psychiatric examination implicated the defendant's rights under the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, when the defendant neither initiated the exam nor put his mental capacity into issue at trial.

In *Smith*, the trial court ordered a competency examination of the defendant. Defense counsel had not raised an issue of competency or sanity and was unaware that the examination was ordered. 451 U.S. at 456-57 n.1. The psychiatrist interviewed the defendant and provided a report to the trial court in which he concluded the defendant was competent to stand trial. 451 U.S. at 457-58. During the penalty phase of the defendant's capital trial, the State called the psychiatrist to testify as to the defendant's future dangerousness—one of three factors the State was required to establish to obtain the death penalty under Texas law. The psychiatrist's testimony included his conclusions that the defendant was a "severe sociopath" with no regard for property or human life, that he would continue his criminal behavior if given the opportunity, and that he had no remorse for his actions.

The Court determined that under the "distinct circumstances" of the case, the Fifth Amendment privilege applied to the examination. 451 U.S. at 466. The Court emphasized that the Fifth Amendment is not implicated by an order requiring a criminal defendant to submit to a competency examination "for the limited, neutral purpose of determining . . . competency to stand trial." 451

U.S. at 465. Further, as long as the examination is conducted consistent with that limited purpose and used for that neutral purpose, there is no Fifth Amendment issue. 451 U.S. at 465, 468-69.

The Court noted that although the scope of the examination went beyond the question of competency, it was not the conduct of the examination that triggered the Fifth Amendment, but its use against the defendant at trial to establish an element necessary to obtain a verdict of death. 451 U.S. at 462, 465, 466 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 581-82, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 [1961]) (the Fifth Amendment requires " 'that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips' "). The Court observed that there would have been no Fifth Amendment issue if the psychiatrist's findings had been used solely for the purpose of determining competency. 451 U.S. at 465. But because "the State used [Smith's] own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty[,]" the Fifth Amendment privilege applied. 451 U.S. at 466.

The Court made clear that its ruling applied only to situations in which the defendant "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence" at trial. 451 U.S. at 468. The Court explained that where a defendant has placed his or her mental state in issue, a court-ordered psychiatric examination may be the only way the State can rebut the defense:

"Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist. [Citations omitted.]" 451 U.S. at 465.

In *Buchanan*, the Court addressed the situation it had distinguished in *Smith*. In *Buchanan*, the defense joined with the prosecution in requesting a court-ordered mental examination of the

defendant and presented evidence supporting a mental-state-based defense at trial. The Court held that under those circumstances, allowing the State to use the results of the mental examination for the limited purpose of rebutting that defense did not violate the defendant's Fifth Amendment privilege. 483 U.S. at 423-24.

In addition to the *Smith/Buchanan* line of precedent, Cheever also relies on *Battie v. Estelle*, 655 F.2d 692 (5th Cir. 1981) and *Gibbs v. Frank*, 387 F.3d 268 (3rd Cir. 2004). In *Battie*, the Fifth Circuit Court of Appeals rejected the argument that a defendant waives his or her Fifth Amendment privilege by requesting or submitting to a psychiatric examination to determine sanity at the time of the crime. The court explained that waiver occurs when the defense introduces psychiatric testimony, in the same manner as would the defendant's election to testify at trial. 655 F.2d at 701-02 n. 22. See also *Powell v. Texas*, 492 U.S. 680, 684, 109 S. Ct. 3146, 106 L. Ed. 2d 551 (1989) (stating that the Fifth Circuit's discussion of waiver in *Battie* is supported by *Smith* and *Buchanan*).

We explore *Gibbs* in some depth, because the Third Circuit Court of Appeals examined and applied the *Smith* and *Buchanan* line of precedent to a situation with similarities to Cheever's case.

The defendant in *Gibbs* was tried twice for the 1984 murder of a security guard in Pennsylvania. In the first trial, the defense requested that an expert be appointed for the purpose of determining whether to raise a mental infirmity defense. After the examination, the defense notified the State of its intent to raise such a defense and, consequently, the State secured an order for its own psychiatric examination. The State's psychiatrist gave the defendant *Miranda* warnings, and the defendant made several inculpatory statements. At trial, Gibbs offered expert testimony to establish a diminished capacity defense, and the State called its own expert witness to rebut the testimony. The defendant was found guilty and sentenced to death, but his conviction was ultimately reversed.

At his second trial, the defendant presented an identity defense, not a mental-state-based defense. Nevertheless, the State was permitted to call its expert psychiatric witness to testify about the inculpatory statements the defendant had made during his exami-

nation. The defendant was convicted, and the conviction was affirmed on direct appeal. On federal habeas review, the Third Circuit addressed the defendant's claim that his Fifth Amendment privilege was violated when the State was permitted to introduce its psychiatrist's testimony despite the fact that the defendant did not raise the diminished capacity defense at his second trial. 387 F.3d at 271.

The Third Circuit examined and synthesized the Supreme Court's precedent to determine the applicable rules for resolving the issue:

> "If we lay these decisions out, the following landscape emerges. A compelled psychiatric interview implicates Fifth and Sixth Amendment rights (*Smith*). Before submitting to that examination, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified (*Smith*). The warnings must advise the defendant of the 'consequences of foregoing' his right to remain silent (*Smith*). The Fifth and Sixth Amendments do not necessarily attach, however, when the defendant himself initiates the psychiatric examination (*Buchanan, Penry*). Similarly, the Fifth—but not Sixth—Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings (*Buchanan, Powell*). But that waiver is not limitless; it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense (*Buchanan, Powell*). Finally, the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes (*Penry*)." 387 F.3d at 274.

Applying this synthesis, the Third Circuit held that while the psychiatrist's testimony was admissible in the first trial at which the defendant had presented a mental capacity defense, it was not admissible at the subsequent trial. The defense had not provided notice of intent to raise a mental capacity defense, the interview was court-ordered and conducted by the State's expert, the defense had not presented psychiatric testimony at trial, and the report was not used for rebuttal; indeed, the report was not even used for psychiatric purposes. 387 F.3d at 274-75.

Kansas statutes and caselaw are consistent with *Smith, Buchanan, Battie,* and *Gibbs.* Under K.S.A. 22-3219(1), in order to present a mental disease or defect defense at trial, a criminal defendant must file a pretrial notice of the intent to do so. Filing such a notice

is deemed to be consent to a court-ordered mental examination. K.S.A. 22-3219(2) ("A defendant who files a notice of intention to assert [a mental disease or defect defense] thereby submits and consents to abide by such further orders as the court may make requiring the mental examination of the defendant . . . ."). See also *State v. Ji*, 251 Kan. 3, 23, 832 P.2d 1176 (1992) (State was entitled to use court-ordered examination of defendant to rebut defendant's insanity defense, despite the fact the examination was conducted without the benefit of *Miranda* warnings; under K.S.A. 22-3219, the defendant's notice of intent to assert insanity defense was consent to the examination, and the defendant presented evidence supporting insanity defense).

Moreover, although filing a notice of intent under K.S.A. 22-3219(1) constitutes consent to a court-ordered examination, the mere fact the defendant submitted to the examination is not a waiver of the privilege so as to allow the State to use that examination against the defendant at trial. The court-ordered examination remains privileged unless and until the defendant presents evidence supporting a mental disease or defect defense at trial. *Cf. State v. Foster*, 259 Kan. 198, 910 P.2d 848 (1996); *State v. Williams*, 20 Kan. App. 2d 185, 884 P.2d 755 (1994).

In *Williams*, the defendant filed a notice of intent to raise an insanity defense and then scheduled and paid for a psychiatric examination of the defendant. The State filed a motion to compel discovery of the report, arguing that K.S.A. 22-3219 required its release. The district court ordered the defendant to produce the report. The defendant then withdrew the notice of intent to use the insanity defense and asked the district court to vacate its order. The district court refused, stating the report had to be produced, regardless of whether it was going to be used. Defense counsel refused to comply, arguing that because the notice was withdrawn, the defendant retained his Fifth Amendment privilege in the report. Defense counsel was held in contempt and they appealed.

A panel of the Court of Appeals reversed the contempt order and held that the trial court's *initial order* to produce the report was consistent with K.S.A. 22-3219(2), because the defendant had filed a notice of intent to assert an insanity defense. 20 Kan. App.

2d at 190. After the defendant withdrew his intent to assert an insanity defense, however, the district court's refusal to reconsider its order to produce was erroneous:

"K.S.A. 1993 Supp. 22-3219(1) *prohibits* admission of any evidence concerning an insanity defense unless a notice of intent to plead insanity has been timely filed or accepted by the court. After appellants withdrew defendant's insanity notice, they became estopped from attacking the presumption of sanity surrounding defendant. K.S.A. 1993 Supp. 22-3219 no longer controlled the discovery of defendant's psychiatric report after defendant's notice of intent to plead insanity was withdrawn." *Williams*, 20 Kan. App. 2d at 191.

In *Foster*, 259 Kan. 198, the defendant argued that the prosecutor committed misconduct by cross-examining him about statements he made during a psychological evaluation to determine sanity. The defendant had filed a notice of intent to assert an insanity defense, but the defendant's psychologist had not testified at the time the prosecutor asked the question. Citing *Williams*, this court held that the defendant's conversations with the psychologist remained privileged until the psychologist testified. 259 Kan. at 210 (citing *Williams*, 20 Kan. App. 2d at 191).

We note that the defendant's objection at trial and the trial court's ruling in *Foster* were based upon the psychologist-client privilege, not the Fifth Amendment privilege and that our analysis in *Foster* does not mention the Fifth Amendment. Nevertheless, our cite to *Williams* for the proposition that the defendant's conversations with the psychologist remained privileged suggests that we recognized the situation implicated the Fifth Amendment privilege.

In summary, we hold that K.S.A. 22-3219 and our caselaw are in harmony with the scope of the Fifth Amendment privilege as construed in the *Smith* and *Buchanan* line of precedent. Read together, the following rules apply.

Where a defendant files a notice of intent to assert a mental disease or defect defense under K.S.A. 22-3219, the Fifth Amendment does not prevent the court from ordering the defendant to submit to a mental examination. *Buchanan*, 483 U.S. at 423-24; *Smith*, 451 U.S. at 465. The filing of such a notice constitutes consent to a court-ordered mental examination by an expert for the

State, making *Miranda* warnings unnecessary. K.S.A. 22-3219(2); *Ji*, 251 Kan. at 23. Consent to the examination, however, does not waive the defendant's Fifth Amendment privilege so as to entitle the State to use the examination against the defendant at trial. Waiver does not occur unless or until the defendant presents evidence at trial that he or she lacked the requisite criminal intent due to a mental disease or defect. *Cf. Foster*, 259 Kan. at 210; *Williams*, 20 Kan. App. 2d at 191. See also *Battie*, 655 F.2d at 702 (submitting to examination does not waive the privilege, waiver occurs when the defendant presents mental-state defense at trial). If the defendant withdraws the notice to assert a mental disease or defect defense or does not present evidence supporting that defense at trial, the Fifth Amendment privilege remains intact and the State may not use the mental examination as evidence against the defendant. *Foster*, 259 Kan. at 210; *Williams*, 20 Kan. App. 2d at 191 (defense withdrew notice of intent to assert insanity defense). If, however, the defendant presents evidence supporting a mental disease or defect defense, the State may use the court-ordered examination for the limited purpose of rebutting the defendant's mental disease or defect defense. 483 U.S. at 423-24.

Applying these rules to Cheever's case, Cheever retained a Fifth Amendment privilege in the Welner examination. Cheever could waive his privilege and allow use of the report under the proper circumstances. Absent such a waiver, however, the report was privileged under the Fifth Amendment.

1. *Did Cheever waive the privilege, thus entitling the State to use the examination for rebuttal?*

The State contends that Cheever presented expert testimony at trial regarding his mental state, and therefore it was entitled to use the examination to rebut that defense. Cheever contends that he did not present evidence of a mental disease or defect defense. Cheever argues his evidence was limited to showing voluntary intoxication, which is not a mental disease or defect under Kansas law and, therefore, the State was not entitled to use the examination for rebuttal.

The only mental capacity defense recognized in Kansas is the mental disease or defect defense, as defined by K.S.A. 22-3220:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense." (Amended L. 2010, ch. 136, sec. 20; now K.S.A. 2011 Supp. 21-5209).

It is well established that voluntary-intoxication-induced temporary mental incapacity at the time of the crime is not evidence of a mental disease or defect. *Kleypas*, 272 Kan. 894, Syl. ¶ 1; *In re Habeas Corpus Petition of Mason*, 245 Kan. 111, 113, 775 P.2d 179 (1989). Evidence of permanent mental incapacity due to long-term use of intoxicants, however, may support a mental disease or defect defense. *Petition of Mason*, 245 Kan. at 114.

In *Kleypas*, the defendant attempted to introduce expert witness testimony that he had experienced a blackout at the time of the offenses due to voluntary intoxication and chronic cocaine use. The State objected that the defendant was attempting an end run around the procedural and substantive consequences of asserting a mental defect defense after having withdrawn his previously filed notice of intent to assert such a defense. The trial court agreed. On appeal, we held that the defendant's expert testimony did not relate to a mental disease or defect but solely to voluntary intoxication, and thus the trial court erred in refusing to allow the defendant to present that evidence. 272 Kan. at 921.

Our *Kleypas* decision was based on *Petition of Mason*, 245 Kan. 111. In *Mason*, the trial court ordered a mistrial after defense counsel told the jury during opening statement that the defense would present evidence that the defendant was in an alcohol-induced blackout at the time of the offense, due, in part, to long-term alcohol abuse. The trial court found that the evidence described would constitute evidence of insanity, not voluntary intoxication, and thus ordered a mistrial because the defendant had not filed notice of an insanity defense. 245 Kan. at 113. We reversed, holding that evidence of *temporary* mental incapacity caused by voluntary intoxication is not evidence of insanity. 245 Kan. at 113 (discussing *State v. Seely*, 212 Kan. 195, 510 P.2d 115 [1973]). We

noted we had previously held that evidence that continued use of intoxicants had caused *"permanent* mental deterioration or disease"* may constitute insanity. *Petition of Mason*, 245 Kan. at 114 (discussing *State v. James*, 223 Kan. 107, 574 P.2d 181 [1977]). But because the defendant was not claiming that his alcohol-induced blackout at the time of the crime was "anything . . . other than temporary," the trial court erred in finding that the evidence described in the defendant's opening statement would be evidence of insanity, rather than voluntary intoxication. 245 Kan. at 113.

Cheever's voluntary intoxication defense was based on evidence that his mental state at the time of the crime was a product of a combination of immediate voluntary ingestion of methamphetamine and long-term use of the drug. Cheever did not present evidence, however, that his use of methamphetamine had caused permanent mental impairment. Evans testified that while neurotoxic changes could potentially be permanent, in most cases, those changes abate after a 4- to 6-month period of nonuse. Evans did not testify that Cheever had sustained permanent damage. In fact, he testified that psychological testing done on Cheever some 6 months after his arrest was unlikely to be useful for determining his mental state at the time of the crime because he would no longer have been suffering the effects of the drug.

Accordingly, we find that Cheever's evidence showed only that he suffered from a temporary mental incapacity due to voluntary intoxication; it was not evidence of a mental disease or defect within the meaning of K.S.A. 22-3220. Consequently, Cheever did not waive his Fifth Amendment privilege and thus permit his court-ordered examination by Dr. Welner to be used against him at trial. Therefore, we conclude that allowing Welner to testify in rebuttal to the voluntary intoxication defense violated Cheever's constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution.

### 2. *Impeachment*

Cheever also argues that allowing the State to use statements he made to Welner to impeach his testimony at trial violated his Fifth Amendment privilege. The State contends that because there is no

evidence Cheever's statements to Welner were unlawfully coerced and Cheever does not make such a claim, there was no reason to exclude that evidence. In its brief, the State argues:

"Whether viewed as a constitutional claim or otherwise, there is no basis for exclusion of Dr. Welner's testimony. The exclusion of relevant evidence obtained by the State in a criminal prosecution is a judicially created remedy designed to safeguard the rights of defendants through its deterrent effect. *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 371, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998). The 'primary purpose of the exclusionary rule "is to deter future unlawful police conduct.' " When there is no government misconduct, there is no basis for applying the exclusionary rule. Because there was no allegation of government misconduct here, the exclusion of Dr. Welner's testimony by the trial court was not warranted."

At oral argument, Cheever noted the State's argument appeared to be based on the rationale of *Harris v. New York*, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971) (defendant's statements, inadmissible in prosecution's case-in-chief as a sanction for failing to provide *Miranda* warnings, may be used to impeach defendant's testimony at trial; the benefits of allowing the prosecution to use the truth-testing device of impeachment outweigh the minimal deterrent value of excluding tainted evidence for all purposes).

We hold the exclusionary rule argument has no relevance here. Cheever's statements to Welner are not excluded as a sanction for governmental misconduct; they are inadmissible because they are protected by the Fifth Amendment privilege against compelled self-incrimination. *Cf. Kansas v. Ventris*, 556 U.S. 586, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009) (evidence protected by Fifth Amendment privilege is inadmissible to prevent violation of the substantive protection of the Fifth Amendment privilege; evidence inadmissible under the exclusionary rule is excluded as a sanction for a constitutional violation that has already occurred).

Although not argued by the parties, we note there is conflicting federal caselaw on the question of whether a defendant's statements made during a court-ordered mental examination, while not admissible to rebut a mental-state defense, may nevertheless be used to impeach the defendant's trial testimony. Compare *United States v. Leonard*, 609 F.2d 1163 (5th Cir. 1980) (construing Fed.

R. Crim. Proc. 12.2[c]; defendant's statements during a court-ordered mental examination are admissible *solely* on the issue of sanity and may not be used for impeachment); and *United States v. Castenada*, 555 F.2d 605 (7th Cir. 1977) (holding that statements made during court-ordered mental examination under 18 U.S.C. § 4244 (1976) that are inadmissible on the issue of guilt, are admissible for impeachment because they go to credibility, not guilt).

We recognize there are compelling, but conflicting, policy rationales for the competing positions. On one hand, prohibiting use for impeachment promotes the candid conversation with the expert that is necessary to produce reliable psychiatric testimony for the government or defendant, as the case may be. 609 F.2d at 1165-66. On the other hand, allowing impeachment of a testifying defendant's inconsistent testimony "protect[s] the integrity of the fact-finding process" by preventing a defendant from " 'pervert[ing]' " the shield provided by the statute " 'into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances.' " *Castenada*, 555 F.2d at 610 (quoting *Harris v. New York*, 401 U.S. 222, 226, 91 S. Ct. 643, 28 L. Ed. 2d 1 [1971]).

We conclude that under the circumstances, resolution of this issue must await another day. The important considerations that underlie this issue have not been appropriately raised, briefed, and argued. In addition, as discussed below, the erroneous admission of Welner's testimony requires reversal and remand of the capital murder and attempted capital murder convictions. Thus, even if we were also to determine that Cheever's statements were properly admitted for impeachment, that determination would not change the outcome in this case.

Last, we address an additional point about the admissibility of Welner's testimony. The trial court suggested that Welner's testimony was admissible for rebuttal because Evans relied on Welner's report in reaching his conclusions. During the arguments over Cheever's objection to the State calling Welner to testify in rebuttal to Evans, the State interjected that Evans had testified he relied on Welner's report. Defense counsel confirmed the State's repre-

sentation. The trial court then stated "that fact standing alone probably allows the State to call him to give his own point of view."

Although defense counsel confirmed the State's representation, the record does not. Evans never stated that he relied upon Welner's report. Evans specifically testified that he did not watch the video of Welner's interview or read the transcript of the interview. The only reference he made to Welner's report is in an exchange between the State and Evans, in which the State commented: "That's what he [Cheever] told Dr. Welner. I guess if you'd read that interview, you'd know that." Evans responded: "I don't remember that piece of Mr. Welner's report."

The trial court did not provide a legal basis for its statement that Evans' reliance on Welner's report supported allowing Welner to testify in rebuttal. Cheever identifies it as a hearsay ruling and focuses his argument on his contention that Evans did not rely on Welner's report. In any event, we need not speculate about the legal basis for the trial court's suggestion that Evans' reliance upon Welner's report provided an alternate ground for allowing Welner to testify, because the record plainly fails to establish that Evans actually did rely upon Welner's report to arrive at his own opinions.

## C. *Harmless Error Analysis*

Because the admission of Welner's testimony violated Cheever's Fifth Amendment privilege against compelled self-incrimination, we apply the federal constitutional harmless error test of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). Under *Chapman*, an error that violates a criminal defendant's constitutional rights requires reversal unless the party who benefitted from the error—here, the State—"proves beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); *Kleypas*, 272 Kan. at 1084 (State must prove beyond a reasonable doubt that federal constitutional error did not contribute to the verdict obtained).

In *Satterwhite v. Texas*, 486 U.S. 249, 258, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988), the United States Supreme Court considered whether the erroneous admission of the defendant's court-ordered psychiatric examination was harmless error under *Chapman*. Because of parallels with Cheever's case, we set out in detail the Court's discussion of the evidence at issue and its effect on the outcome:

"Dr. Grigson [who conducted the examination of the defendant] was the State's final witness. His testimony stands out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message. Dr. Grigson was the only licensed physician to take the stand. He informed the jury of his educational background and experience, which included teaching psychiatry at a Dallas medical school and practicing psychiatry for over 12 years. He stated unequivocally [*sic*] that, in his expert opinion, Satterwhite 'will present a continuing threat to society by continuing acts of violence.' He explained that Satterwhite has 'a lack of conscience' and is 'as severe a sociopath as you can be.' To illustrate his point, he testified that on a scale of 1 to 10— where 'ones' are mild sociopaths and 'tens' are individuals with complete disregard for human life—Satterwhite is a 'ten plus.' Dr. Grigson concluded his testimony on direct examination with perhaps his most devastating opinion of all: he told the jury that Satterwhite was beyond the reach of psychiatric rehabilitation.

"The District Attorney highlighted Dr. Grigson's credentials and conclusions in his closing argument:

'Doctor James Grigson, Dallas psychiatrist and medical doctor. And he tells you that on a range from 1 to 10 he's ten plus. Severe sociopath. Extremely dangerous. A continuing threat to our society. Can it be cured? Well, it's not a disease. It's not an illness. That's his personality. That's John T. Satterwhite.'

"The finding of future dangerousness was critical to the death sentence. Dr. Grigson was the only psychiatrist to testify on this issue, and the prosecution placed significant weight on his powerful and unequivocal testimony. Having reviewed the evidence in this case, we find it impossible to say beyond a reasonable doubt that Dr. Grigson's expert testimony on the issue of Satterwhite's future dangerousness did not influence the sentencing jury." 486 U.S. at 259-60.

*Satterwhite* involved the admission of evidence in the penalty phase of a capital murder proceeding, while here, Welner's testimony was admitted in the guilt stage. As the Court recognized in *Satterwhite*, assessing the prejudicial effect of error in the sentencing phase can be more difficult because of the discretion the jury has in determining whether death is the appropriate punishment. 486 U.S. at 258. That difference notwithstanding, we find

the Court's analysis of the prejudicial effect of the error in admitting psychiatric evidence instructive for the ways in which it parallels Cheever's case.

As with Grigson's testimony in *Satterwhite*, Welner's "testimony stands out both because of his qualifications . . . and because of the powerful content of his message." 486 U.S. at 259. Welner's background and qualifications were significantly more impressive than Evans'. Welner testified about his board certifications in psychiatry, forensic psychiatry, and advanced clinical psychopharmacology. His experience included private practice and teaching, both as an associate professor of psychiatry at New York University School of Medicine and as an adjunct professor of law at Duquesne University School of Law at the University of Pittsburgh. He testified at length about his background, including an American Psychiatric Association award, keynote speaking engagements, research work, publications, and testimony before state legislatures on psychiatry and the law.

Evans' credentials were simply not on the same level—a point the State highlighted during its cross-examination of Evans. Through its questions, the State obtained Evans' acknowledgment that he was not a medical doctor or a psychiatrist.

The content of Welner's testimony also stands out. Welner was the last witness the jury heard during the guilt phase of the trial, and his testimony was extensive and devastating. He employed a method of testifying that virtually put words into Cheever's mouth. He focused on the events surrounding the shootings, giving a moment-by-moment recounting of Cheever's observations and actual thoughts to rebut the sole defense theory that he did not premeditate the crimes. He characterized Cheever as a person who had chosen an antisocial outlaw life style and who was indifferent to the violence he had committed. *Cf. State v. Vandeweaghe*, 351 N. J. Super. 467, 799 A.2d 1 (2002), *aff'd* 177 N. J. 229, 827 A.2d 1028 (2003) (Welner's testimony that defendant had antisocial personality disorder and was a liar, presented in rebuttal to intoxication defense, was highly prejudicial plain error, requiring reversal).

Arguably, it is possible the jury might have convicted Cheever even without Welner's testimony; however, that is not the standard

we must apply under *Chapman*. "The question . . . is not whether the legally admitted evidence was sufficient to support" the verdict, "but, rather, whether the State has proved 'beyond a reasonable doubt that the error complained of *did not* contribute to the verdict obtained.' " *Satterwhite*, 486 U.S. at 258-59 (quoting *Chapman*, 386 U.S. at 24).

Because this error violated Cheever's federal constitutional rights, we must reverse unless we can say with "the highest level of certainty that the error did not affect the outcome." *Ward*, 292 Kan. at 564. After reviewing the entire record, we do not have that level of certainty; we cannot conclude beyond a reasonable doubt that Welner's testimony did not contribute to the verdict in this case. Consequently, the error is not harmless, and Cheever's convictions for capital murder and attempted capital murder must be reversed and remanded for a new trial.

Our decision reversing Cheever's convictions for capital murder and attempted capital murder make it unnecessary to resolve the other issues Cheever has raised. Nevertheless, because we are remanding the case for a new trial, we will address those issues that are likely to arise on remand in order to provide guidance to the trial court. *State v. Scott*, 280 Kan. 54, 107, 183 P.3d 801 (2008); *Kleypas*, 272 Kan. at 1057.

## II. FELONY MURDER AS A LESSER INCLUDED OFFENSE OF CAPITAL MURDER

The trial court instructed the jury on first-degree premeditated murder as a lesser included offense of capital murder. On appeal, Cheever argues that the first-degree murder instruction should have included the alternative theory of felony murder as a lesser included offense of capital murder. Cheever acknowledges he did not request such an instruction or object to its absence in the district court; thus the trial judge did not have an opportunity to address this issue.

Cheever argues that capital murder and first-degree murder are different degrees of the crime of homicide under K.S.A. 21-3107(2)(a); therefore, first-degree murder, which includes felony murder, is a lesser included crime of capital murder. We agree.

K.S.A. 21-3107(2) sets out the definition of lesser included crimes:

"(2) . . . A lesser included crime is:
(a) A lesser degree of the same crime;
(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;
(c) an attempt to commit the crime charged; or
(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)."

Kansas has long-recognized that the generic crime of homicide, " 'of which murder is the highest and most criminal species, is of various degrees, according to circumstances. The term . . . is generic, embracing every mode by which the life of one man is taken by the act of another.' " *State v. Gregory*, 218 Kan. 180, 182-83, 542 P.2d 1051 (1975) (citing *State v. Ireland*, 72 Kan. 265, 270, 83 Pac. 1036 [1905] [quoting *Commonwealth v. Webster*, 59 Mass. 295, 1850 WL 2988 (1850)]. Thus, in *Gregory*, we held that involuntary manslaughter is a lesser degree of second-degree murder and is therefore a lesser included crime under K.S.A. 21-3107(2)(a). We explained that while it appears murder and manslaughter are different crimes, " 'they involve but one crime and are only degrees of felonious homicide.' " 218 Kan. at 183 (quoting Warren on Homicide § 83, pp. 415-16).

To date, our caselaw has recognized the following homicide degree crimes, in descending order: first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. See *State v. Garcia*, 272 Kan. 140, 150, 32 P.3d 188 (2001), *disapproved on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). Before the capital murder statute was enacted in 1994, first-degree murder was recognized as the highest degree of our homicide crimes. See *State v. Bradford*, 219 Kan. 336, 343, 548 P.2d 812 (1976) ("First-degree murder, whether felony murder or not, is the highest degree of homicide."). We have not had occasion to consider whether capital murder is part of the homicide-degree-crime structure for purposes of K.S.A. 21-3107(2)(a).

Capital murder is first-degree murder, with "one or more specific elements beyond intentional premeditated murder" that func-

tion as part of the constitutionally required narrowing process. *Marsh*, 548 U.S. at 175-76. It logically follows, and we hold, that capital murder is now the highest degree of homicide in Kansas.

With capital murder as the highest degree of homicide, first-degree murder is a lesser degree of capital murder under K.S.A. 21-3107(2)(a) and is therefore a lesser included crime of capital murder. The crime of first-degree murder may be committed in two ways: premeditated murder and felony murder. See *State v. Hoge*, 276 Kan. 801, 810, 80 P.3d 52 (2003) (premeditated murder and felony murder are alternate means of committing the same crime and are not separate and distinct crimes); *State v. McKinney*, 265 Kan. 104, 110, 961 P.2d 1 (1998) ("Felony murder is not a lesser degree of murder than premeditated murder. Felony murder is first-degree murder; premeditated murder is first-degree murder."). Accordingly, felony murder is a lesser included crime of capital murder and, where facts support it, should be included in instructions on lesser included crimes in capital murder cases.

We note that K.S.A. 21-3107 has been amended recently to eliminate lesser degrees of the crime of felony murder. See K.S.A. 2011 Supp. 21-5109(b)(1), as amended by L. 2012, ch. 157, sec. 2 (A lesser included crime is "[a] lesser degree of the same crime, except that there are no lesser degrees of murder in the first degree under subsection [a][2] [felony murder] of K.S.A. 2011 Supp. 21-5402."). This amendment has no bearing on our analysis. The issue at hand concerns whether felony murder is a lesser degree of the crime of capital murder, not whether some other offense is a lesser degree of felony murder.

### III. Voir Dire Comments Mentioning Appellate Review

The trial court divided the prospective jurors into seven panels for voir dire. The trial court's introductory remarks to each panel were substantially similar and began by introducing the parties, their counsel, and court personnel, including the court reporter. In explaining the role of the court reporter, the trial court told the prospective jurors that the court reporter's written record of the proceedings served two purposes: for reference during the trial and for appellate review should the case be appealed.

The following remarks made to the seventh panel are representative of those made to all of the panels:

"Almost everything is on the record that we do in here.

"We refer back to that record from time to time during the trial to see what someone said, whether a question's already been asked, things of that nature, and if this case should go up on appeal to the appellate courts in Kansas in Topeka, a transcript is made of everything we do and that transcript is sent to the appellate court, along with the exhibits, and the appellate court decides all issues on appeal based on that record that we've made here in the trial court."

Cheever argues that the trial court's remarks violated the Eighth Amendment to the United States Constitution as applied in *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985) (holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"). Cheever contends the trial judge's remarks in this case created the risk that the jurors would believe that the ultimate responsibility for Cheever's sentence rested with the appellate courts, thereby undermining the heightened reliability the Eighth Amendment demands of a jury's determination that death is the appropriate punishment.

In *Caldwell*, the prosecutor argued to the jury that a decision to impose the death sentence would not be final because it was subject to review by the appellate court. The Supreme Court held the remarks rendered the death sentence unconstitutional. The Court explained that remarks that "[seek] to minimize the jury's sense of responsibility for determining the appropriateness of death" undermine the reliability of the jury's death sentence in violation of the Eighth Amendment. 472 U.S. at 341. See also *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994) (*Caldwell* is " 'relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.' ") (quoting *Darden v. Wainwright*, 477 U.S. 168, 183 n.15, 106 S. Ct. 2464, 91 L. Ed. 2d 144 [1986]).

*State v. Nguyen*, 251 Kan. 69, 833 P.2d 937 (1992), provided this court with an opportunity to consider whether a trial judge commits judicial misconduct by mentioning to a jury the possibility that the case before it could be appealed. In explaining the process for the jury to submit questions or request readbacks during deliberations, the judge said:

> " 'I explained to you that if I get a question, and that will be through my bailiff, Ms. Mies, the foreman will write it down and date it. And I would request also that he write the time—he or she write the time on there. That question will be preserved, 'cause defense, regardless, would have a right to appeal. As I told you, that a judge is under a microscope and that [to] be sure that any defendant receives the correct legal decisions. I can be challenged. And I welcome the challenges.' " 251 Kan. at 78-79.

The defendant argued that mentioning the right to appeal was improper because the remarks "lessened the jury's sense of responsibility in the correctness of its decision and the jury's belief in the importance of its decision[,] . . . might have given the jurors the impression that a mistake in their findings of fact also would be correctable by appeal[, and]. . . created the impression the court believed he was guilty." 251 Kan. at 79. Although we found the comments were not prejudicial, we unequivocally stressed that "[a] trial court should not mention a defendant's right to appeal." 251 Kan. at 80.

*Nguyen* was not a death penalty case; however, the reasoning is consistent with *Caldwell*. Accordingly, we take this opportunity to reiterate our general directive: It is improper for a trial court to make comments to the jury regarding appellate review. Moreover, we emphasize that the life-or-death stakes in a capital murder proceeding require extra vigilance on the part of the trial court to abide by this directive. We note the remarks in this case are not analogous to those that required reversal in *Caldwell*. Nevertheless, under *Nguyen*, it is error for the trial judge to tell jurors, even prospective jurors, that the exhibits and transcripts of the proceedings will be reviewed by an appellate court. Whether that error would be held to be prejudicial depends on the specific circumstances of the particular case; however, because it is error that is entirely within the judge's power to avoid, it should be avoided.

## IV. CHEEVER'S AGE AT THE TIME OF THE OFFENSE

Cheever argues that his death sentence was imposed in violation of his right to jury trial under the Sixth and Fourteenth Amendments to the United States Constitution because the jury did not find beyond a reasonable doubt that he was at least 18 years old at the time of the crime, a fact that he contends is necessary to render him eligible for the enhanced sentence of death. Cheever does not dispute that he was at least 18 years old at the time of the capital offense.

The Sixth Amendment right to jury trial requires that any fact, other than a prior conviction, "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). In *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Court extended the holding of *Apprendi* to capital sentencing proceedings. There, the Court held that Arizona's sentencing scheme violated the Sixth Amendment right to jury trial because it permitted a judge to find the existence of statutory aggravating factors necessary to impose the death penalty. 536 U.S. at 609 (overruling *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 [1990]). Under *Ring*, all facts necessary for imposition of the death penalty must be found by a jury beyond a reasonable doubt. 536 U.S. at 602, 609.

Resolution of this issue therefore hinges on whether the fact Cheever was at least 18 years of age at the time of the crime is a fact necessary for imposition of the death penalty. Cheever argues that it is, relying primarily on *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."). Cheever points out that *Roper* held that being 18 years or older at the time of the offense is an *eligibility requirement* for the death penalty. 543 U.S. at 574 (18 is "the age at which the line for death eligibility ought to rest"). Moreover, he notes, the Court specifically rejected the suggestion that youth should be con-

sidered as a mitigating factor on a case-by-case basis and instead "[drew] the line at 18 years of age" as a "categorical rule[]." 543 U.S. at 574.

Cheever also points to K.S.A. 21-4622 of our capital sentencing statutes. That statute provides:

> "Upon conviction of a defendant of capital murder and a finding that the defendant was less than 18 years of age at the time of the commission thereof, the court shall sentence the defendant as otherwise provided by law, and no sentence of death or life without the possibility of parole shall be imposed hereunder."

Cheever contends that under this statute, it is a prerequisite to the imposition of the death penalty that the defendant be 18 years of age or older at the time the capital murder offense was committed.

Cheever also cites our Jessica's Law cases. In them, we addressed the question of age as an element of the offenses designated for enhanced sentencing under K.S.A. 21-4643 (requiring life sentence with mandatory minimum of 25 years for a defendant convicted of specified offenses and who was at least 18 years old at the time of the offense). Applying *Apprendi*, we have held that when a defendant is charged with the more serious off-grid version of the crime subject to enhanced sentencing, the defendant's age at the time of the offense is a fact that must be submitted to the jury and proved beyond a reasonable doubt. See *State v. Gonzales*, 289 Kan. 351, Syl. ¶ 11, 212 P.3d 215 (2009); *State v. Bello*, 289 Kan. 191, Syl. ¶ 4, 211 P.3d 139 (2009); *State v. Morningstar*, 289 Kan. 488, 495, 213 P.3d 1045 (2009); *State v. Reyna*, 290 Kan. 666, 676, 234 P.3d 761 (2010).

Tying these together, Cheever argues that because the death penalty cannot be imposed unless the defendant was at least 18 years old at the time the crime of capital murder was committed, the defendant's age is a fact necessary to the imposition of a death sentence, just as a defendant's age at the time of the offense is a fact necessary to the imposition of the enhanced sentencing provision of Jessica's Law. Therefore, the Sixth Amendment requires that the fact that he was at least 18 years old at the time of the crime be submitted to and found by a jury beyond a reasonable doubt.

The State responds that the defendant's age is not within the scope of *Apprendi* because it is not a fact that increases the statutory maximum sentence. According to the State, death is the maximum authorized sentence under our capital sentencing statutes, with the defendant's age merely a fact that mitigates that sentence to life in prison. The State cites K.S.A. 21-4622, which provides that upon a finding that the defendant was "less than" age 18, the defendant shall not be sentenced to death. The State argues that because the finding as to the defendant's age does not increase the severity of the maximum sentence, it is not a fact that must be found by a jury beyond a reasonable doubt.

We deem the State's arguments unpersuasive. First, we disagree that death is the maximum authorized sentence. The statutory maximum penalty for Sixth Amendment purposes is determined by the facts reflected by the jury's verdict. *Ring*, 536 U.S. at 602 (the Sixth Amendment prohibits exposing a defendant " 'to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.' " Under K.S.A. 21-4624(e), life in prison without parole—not death—is the maximum sentence that can be imposed based *solely* on a jury's verdict finding a defendant guilty of capital murder. K.S.A. 21-4624(e) ("the defendant shall be sentenced to life without the possibility of parole" *unless* "by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the [statutory] aggravating circumstances . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist").

Second, the Supreme Court in *Roper* explicitly rejected the idea that the Eighth Amendment could be satisfied by treating the defendant's youth as a mitigating circumstance. Instead, the Court drew a bright line, holding that the age of 18 or older is a requirement for death eligibility. 543 U.S. at 574.

Third, under our statutory scheme, the fact the defendant was at least 18 is a prerequisite to imposition of the death penalty. Although K.S.A. 21-4622 refers to a finding that the defendant was *under* age 18, it is clear that a capital sentencing proceeding *does not even occur* if a defendant is found to be less than 18 years of

age at the time of the commission of the capital murder. See K.S.A. 21-4624(b) (*"Except as provided in K.S.A. 21-4622 . . .* upon conviction of a defendant of capital murder, the court, upon motion of the county or district attorney, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death." [Emphasis added.])

Accordingly, we conclude that the fact the defendant was at least 18 years old at the time of the crime is a fact necessary to subject the defendant to the death penalty and therefore within the scope of Sixth Amendment protection.

Because we are addressing this issue only for guidance on remand, we need not address Cheever's arguments that the same conclusion is dictated by our Jessica's Law jurisprudence. We hold only that it is required by *Ring* and *Roper.* Similarly, we need not decide whether the failure to instruct the jury to find the defendant's age was harmless under the facts of this case. See *State v. Colston,* 290 Kan. 952, 975, 235 P.3d 1234 (2010) (citing *Reyna,* 290 Kan. 666, Syl. ¶ 10) (harmless error analysis applies to error in omitting element of defendant's age where age was uncontested and supported by overwhelming evidence).

Additionally, we decline to address, and express no opinion on, whether the lack of a jury finding that Cheever was at least 18 years of age at the time of the crime is a determination on the sufficiency of the evidence for purposes of double jeopardy. *Cf. State v. Hernandez,* 294 Kan. 200, 209-10, 273 P.3d 774, 780 (2012) (declining to address whether an *Apprendi* error in a noncapital case is equivalent to a determination that the evidence was insufficient to support the conviction for double jeopardy purposes when the issue was not raised, briefed, or argued on appeal). As we noted in *Hernandez,* the parties are free to raise such an issue on remand. 294 Kan. at 211.

## V. PENALTY-PHASE INSTRUCTIONS ON MITIGATING CIRCUMSTANCES

*State v. Kleypas* contained the following directive concerning instruction of juries on mitigating circumstances in death penalty cases:

"[A]ny instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision." 272 Kan. 894, 1078, 40 P.3d 139 (2001).

The penalty-stage jury instructions in this case did not state that mitigating circumstances need not be proved beyond a reasonable doubt. Cheever argues that as a result, the instructions did not conform to Kansas law.

We note that the instruction at issue followed PIK Crim. 3d 56.00-D (2003 Supp.). That pattern instruction did not conform to our directive in *Kleypas*. In 2008, PIK Crim. 3d 56.00-D was amended to inform the jury that mitigating circumstances do not need to be proved beyond a reasonable doubt. In any retrial of this case, the most current version of the PIK Crim. 3d instructions on mitigating evidence should be used.

## VI. MERCY INSTRUCTION

Cheever challenges the mitigating circumstances instruction on another ground, specifically, the following part:

"Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense.

"The appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed."

Cheever argues that by characterizing mercy as a mitigating circumstance and placing it in the context of the weighing equation, the instruction prevents the jurors from being able to give full effect to mercy as a basis for a sentence less than death, in violation of the Eighth Amendment. Cheever argues that the jurors must be allowed the opportunity to extend mercy and impose a life sentence *after* determining that the mitigators do not outweigh the aggravators and death is the appropriate sentence by law. He suggests the following language would properly allow jurors who choose to exercise mercy to give effect to that decision:

"Whether or not the mitigating circumstances outweigh the aggravating circumstances, you may recommend mercy for the Defendant and sentence him to life imprisonment."

This same argument was made and rejected in *Kleypas*:

"Kleypas argues that while the instruction introduces the concept of exercising mercy to the jury, it does so in a legally insufficient manner. Kleypas argues that mercy, if it is to be exercised, must be exercised only after the jury has weighed aggravating and mitigating circumstances and determined that a sentence of death is warranted. According to Kleypas, only *after* the jury has decided that Kleypas should be put to death can it truly exercise mercy and instead impose a nondeath sentence, thus mercy itself should not be characterized as a mitigator." 272 Kan. at 1035-36.

We found the argument was not persuasive. First, we held the defendant was not entitled to a mercy instruction under federal or state law:

"[T]he United States Supreme Court has held that the Eighth Amendment requires two things of a death sentence: (1) The sentencer must not have unbridled discretion in determining the fate of the defendant, and (2) the defendant must be allowed to introduce any relevant mitigating evidence of his character or record or circumstances of the offense. *California v. Brown*, 479 U.S. 538, 541, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987). A mercy instruction per se is simply not required as part of this equation by federal or state law, nor is a specific type of mercy instruction." 272 Kan. at 1036.

Second, we held that the instruction, as given, properly and adequately informed the jury of the role of mercy in the weighing process. 272 Kan. at 1036.

Cheever argues, however, that the United States Supreme Court's decision in *Marsh*, 548 U.S. 163, provides grounds for reconsideration of that holding in *Kleypas*. According to Cheever, the Court's interpretation of the weighing process as *the decision* for life or death and its recognition that Kansas' mercy instruction " 'eliminate[s] the risk that a death sentence will be imposed in spite of facts calling for a lesser penalty,' " provides new support for his argument. Neither party mentions that in *Scott*, we addressed and rejected this argument, concluding that nothing in *Marsh* required such an instruction:

"We do not find Scott's arguments to support additional instructions persuasive. *Kansas v. Marsh* cannot be read to require an additional step beyond weighing.

In fact, the United States Supreme Court specifically reasoned a decision that the aggravating and mitigating factors are in equipoise is a decision supporting imposition of the death penalty[.]" 286 Kan. at 98.

Cheever's argument is the same argument we considered and rejected in *Kleypas*, and his further argument that the *Marsh* decision justifies a different conclusion was resolved against him by our decision in *Scott*. Cheever offers nothing new to support revisiting the decisions in those cases.

## VII. PROSECUTORIAL MISCONDUCT DURING PENALTY STAGE

Cheever contends that certain comments concerning consideration of mitigating circumstances made by the prosecutor during the penalty-stage closing argument constitute prosecutorial misconduct.

The first comment at issue was made during the State's closing argument rebuttal:

"Ladies and gentlemen, let's start off by looking at these mitigating circumstances offered to you by the defendant, which Judge Ward has contained in the instructions. First of all, it's important to remember that these are contentions only. The judge, by instructing you about these, is not suggesting to you that they are true. What he's telling you is that the defendant has put these before you, *you can consider them if you choose, but you don't have to*. Or you can give them as little weight as you choose to give them." (Emphasis added.)

Cheever contends the highlighted remark told the jury that it did not have to consider mitigating circumstances. Cheever argues that because the Eighth Amendment is violated when a capital sentencing jury is precluded from considering relevant mitigating evidence that might serve as a basis for a life sentence, the remark was improper.

The Eighth Amendment's concern for " 'reliability in the determination that death is the appropriate punishment in a specific case" requires that a capital sentencing jury not be precluded from considering and giving effect to mitigating evidence offered by a defendant as a basis for a sentence less than death. *Penry v. Lynaugh*, 492 U.S. 302, 328, 1095 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 [1976]). In *Lockett v. Ohio*, 438 U.S.

586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), the Supreme Court considered an Ohio death penalty statute that allowed only three specific factors set out in the statute to be considered in mitigation. The Court held that under its decisions in *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), and *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976), to satisfy the Eighth Amendment's individualized sentencing requirement, "a death penalty statute must not preclude consideration of relevant mitigating factors." 438 U.S. at 608. The Court explained:

"[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio*, 438 U.S. at 605.

Although *Lockett* involved a statute, it applies "whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute," by a trial court's evidentiary ruling, by jury instructions, or by prosecutorial argument. *Mills v. Maryland*, 486 U.S. 367, 375, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988). See also *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007) (recognizing that prosecutorial argument that prohibits a jury from being able to consider relevant mitigating evidence can violate the Eighth Amendment).

It is important to understand the scope of the *Lockett* rule, however. It is violated only when the jury is prevented, *as a matter of law*, from considering mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 113, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). It does not prohibit a capital sentencing jury from assessing the weight of mitigating evidence "and find[ing] it wanting as a matter of fact[.]" 455 U.S. at 113.

In *Eddings*, the sentencing court had determined that it could not consider the defendant's evidence of his violent upbringing and resulting emotional problems as mitigation because it was not mit-

igating under the law. The Oklahoma Court of Criminal Appeals agreed, concluding that evidence must tend to provide a legal excuse for criminal conduct in order to be legally relevant to mitigation. In reversing the Oklahoma decision, the Supreme Court recognized the constitutional distinction between considering and rejecting relevant mitigating evidence based on the circumstances of the case and being legally precluded from or refusing to consider such evidence as a matter of law.

We recognized this distinction in *Kleypas*. Based on *Eddings* and subsequent cases, we held that a *Lockett*-based constitutional violation occurs only when the State " ' "cut[s] off in an absolute manner" ' " the sentencer's consideration of mitigating evidence. 272 Kan. at 1074 (quoting *Johnson v. Texas*, 509 U.S. 350, 361, 113 S. Ct. 2658, 125 L. Ed. 2d 290 [1993]) (addressing defendant's challenge to the mitigating circumstances instruction). Thus, we held it is constitutionally permissible for a prosecutor to argue, based on the circumstances of the case, that certain circumstances should not be considered as mitigating circumstances. 272 Kan. at 1102-03.

The prosecutor's comment in this case was part of an argument that the mitigating circumstances identified in the instructions were only contentions and, as such, the jury did not have to accept them as established simply because they were listed in the instructions. That comment was not an effort to "cut off in an absolute manner" the jury's consideration of Cheever's mitigating evidence. 272 Kan. at 1074. The larger argument, moreover, was consistent with the law and the instructions. See PIK Crim. 3d 56.00-D ("The defendant *contends* that mitigating circumstances include, but are not limited to, the following . . . ."). See also K.S.A. 21-4624(e); PIK Crim. 3d 56.00-D ("The determination of what are mitigating circumstances is for you as individual jurors to decide under the facts and circumstances of the case."). It was not improper.

Cheever raises the same claim concerning two other comments made during the State's penalty-stage rebuttal argument. The first of these related to Cheever's mitigating circumstance that he was exposed to drug use in the home:

"Now, perhaps there was marijuana use at the home. We don't contend there wasn't. But what it boils down to, ladies and gentlemen, is that a mitigator, is that a mitigator which is sufficient to outweigh the aggravating factors we put before you? Marijuana use in the home, that's a bad thing. No question about it. *But does that, as Mr. Evans say[s], excuse what he did*? Is that—does that outweigh the aggravating factors? *We contend it does not and it cannot.*" (Emphasis added.)

The second comment concerned Cheever's mitigating circumstance that he "was addicted to methamphetamine and he was under its influence at the time of the crime." The prosecutor argued:

"The defendant tells us he was addicted to methamphetamine, and that's the reason, that's a mitigator. Well, tell that to Robert Sanders 'cause he wasn't on methamphetamine that night. Now, you've already decided methamphetamine did not play a role in the capital murder of Matt Samuels. And you should reject it now, too."

Cheever argues these comments told the jury that it did not have to consider mitigating evidence if it did not excuse the crime or have a causal link to the crime. In support, Cheever relies on *Kleypas*, where we held: "A prosecutor who argues that mitigating circumstances must excuse or justify the crime improperly states the law." 272 Kan. at 1103.

The prosecutor in *Kleypas* made several arguments, discussed at length in the opinion, which we found violated this rule. We reached a different conclusion on a similar claim in *Scott*. There, we acknowledged that while there was some suggestion in the comments that the defendant's "mental illness did not excuse his culpability," read in context, the comments were an argument "that [the defendant's] mental illness was not as severe as he made it out to be, because it did not 'prevent' him from committing the crimes." 286 Kan. at 118.

The difference between the outcomes in *Kleypas* and *Scott* lies in the distinction recognized in *Eddings*: comments that cut off in an absolute manner the jury's consideration of certain mitigating evidence run afoul of *Lockett*, but comments that the defendant's mitigating evidence is entitled to little or no weight based on the circumstances of the case are constitutionally permissible. 272 Kan. at 1074.

Addressing the "excuse" comment first, we find the comment, considered in context, was permissible. As with the comments in *Scott*, there is some suggestion in the remark that marijuana use in the home did not excuse Cheever's culpability. See *Scott*, 286 Kan. at 118. That remark, however, was followed with: "[D]oes that outweigh the aggravating factors? We contend it does not and it cannot." Viewed in context, the prosecutor's comments did not tell the jury that to be considered in mitigation, evidence of the marijuana use in the home had to excuse or justify the crime as a matter of law. Instead, the remarks were directed at the weight the jury should give that evidence in deciding whether the mitigating circumstances outweigh the aggravating factors.

Cheever argues that the comment "tell that to Robert Sanders 'cause he wasn't on methamphetamine that night," improperly suggested that his mitigation evidence had to have a causal link to the crime in order to be considered. We disagree. Viewed in context, the comment was part of the State's argument addressing evidence concerning a specific mitigating circumstance: that Cheever was under the influence of methamphetamine at the time of crime. We note that that particular mitigating circumstance *alleged* a causal relationship between the crime and methamphetamine use. Cheever cannot now complain if the State responded to that contention. In any event, the *Eddings* distinction is determinative. The point of the prosecutor's comment was simply that because the evidence showed Cheever committed a violent criminal act when he was not under the influence of methamphetamine, the jury should give little weight to Cheever's mitigating circumstance that he was under the influence of methamphetamine at the time of the crime. As such, it was not improper.

The last comment at issue concerned the jury's rejection of Cheever's voluntary intoxication defense in the guilt stage: "[Y]ou've already decided methamphetamine did not play a role in the capital murder of Matt Samuels. And you should reject it now." According to Cheever, this remark suggested to the jury that because it rejected the voluntary intoxication defense at the guilt stage, it could reject Cheever's mitigating circumstance that he was under the influence of methamphetamine at the time of the crime.

Although the prosecutor said "you *should* reject it," the remark crossed the line between comment on the weight of the evidence as it relates to specific mitigating circumstances and argument to the jury that it *could not* consider a mitigating circumstance *as a matter of law*. Not only is such an argument an incorrect statement of the law, it could lead a juror to refuse to consider legally relevant mitigating evidence, in violation of the Eighth Amendment. We strongly suggest the State avoid this argument on remand.

The convictions and sentences for manufacture of methamphetamine and criminal possession of a firearm are affirmed. The convictions for capital murder and attempted capital murder are reversed, and the case is remanded for a new trial.

* * *

ROSEN, J., concurring: I concur with the majority but write separately only to comment on Cheever's argument that jurors be allowed the opportunity to consider mercy after finding a determination of death is warranted.

As a result of our decision in *State v. Stallings*, 284 Kan. 741, 163 P.3d 1232 (2007), capital defendants are denied the statutory right of allocution to the sentencing jury. See K.S.A. 22-3424(e) (defendant must be given opportunity to address the court, make a statement on the defendant's own behalf, and present evidence in mitigation of punishment). Thus, a capital defendant is deprived of any meaningful opportunity to make a plea for mercy, indeed for his or her very life, before the sentencing jury makes a decision whether the defendant is to be put to death. I dissented from the decision in *Stallings* and write here to make clear my opinion that Cheever, like all criminal defendants, should be afforded an opportunity to offer a direct allocutory statement in mitigation to his sentencer.