No. 104,474

STATE OF KANSAS, *Appellee*, v. ISRAEL G. MIRELES, *Appellant*.

(301 P.3d 677)

340

Opinion filed May 10, 2013.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause and was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Israel G. Mireles was convicted of capital murder and rape. The district court sentenced him to a life sentence without the possibility of parole for the murder conviction and imposed a consecutive 203-month prison sentence for the rape conviction. Mireles now brings this appeal in order to challenge the district court's decision to allow numerous photographs into evidence and its failure to instruct the jury on felony murder as a lesser included

offense of capital murder. Mireles also argues that due to prosecutorial misconduct, he was denied a fair trial.

## FACTS

In the fall of 2007, Joe Terzui opened the Bella Casa Italian Restaurant in El Dorado, Kansas. The restaurant was located next to and shared a parking lot with the El Dorado Motel. Terzui leased the restaurant's building from the owner and operator of the motel, I.C. Patel.

Mireles had worked off and on for Terzui the previous 3 years at restaurants Terzui had opened in Vernon, Texas, and Hays, Kansas. In early October 2007, Mireles, along with his girlfriend, Victoria Martens, moved from Hays to El Dorado to help Terzui at the new restaurant. While in El Dorado, Mireles and Martens lived in a room at the motel (Room 21) that Terzui had rented for them.

A week before Thanksgiving 2007, Mireles and Martens decided to move to Texas to find new jobs. The couple's plan was for Martens to spend Thanksgiving Day in Baxter Springs, Kansas, with her family while Mireles stayed behind in El Dorado. On the Friday after Thanksgiving, Mireles planned to quit his job, collect his wages, rent a car, pack up the couple's possessions, and travel to Baxter Springs to pick up Martens. The couple would then travel to Texas to visit Mireles' grandmother and then stay with Mireles' family until they could find a place of their own.

On Thanksgiving Day, Martens' mother picked her up at the motel and took her to her grandmother's house in Baxter Springs. As planned, Mireles stayed in El Dorado for Thanksgiving Day; he did not work that day. On the afternoon of Friday, November 23, Mireles received $600 from Terzui. After receiving this money, Mireles rented a 2007 Ford Taurus from a car rental business in El Dorado and proceeded to run some errands around town. After doing so, he went to the Beijing Restaurant in El Dorado for drinks. He arrived there sometime between 7 and 8 p.m. and sat in the bar area of the restaurant.

At about this same time, E.S., an 18-year-old student at Butler County Community College, arrived at the Beijing Restaurant with Keeley McFann. Other acquaintances of E.S. and McFann arrived

at the restaurant and soon joined them in the bar area: Brad Scott, Greg Bostwick, Misty Walton, and three of Walton's friends. They eventually all sat at a table and began socializing over drinks.

Mireles, a person no one in the group had met before, then walked over to the table from his seat at the bar and joined the group. Mireles proceeded to buy drinks for everyone at the table. Mireles paid particular attention to the females in the group, talking to them and continually buying them drinks.

While sitting at the table, Mireles told Scott about working at the Italian restaurant and about how he was going to visit his grandmother who was ill. Mireles also told Scott that he borrowed some money so he could pay for the visit and proceeded to show Scott the money he possessed. Mireles held the money so everyone at the table could see it. Later on, Mireles asked people at the table if they knew where to get drugs. He suggested to the group that they travel to Wichita to buy cocaine and then come back to his motel room to party. Scott told Mireles that he was not interested. Scott could not remember if anyone else explicitly objected to Mireles' plan.

As closing time for the restaurant drew near, the group decided to continue the night at the Retreat, a bar in El Dorado. They left the restaurant and traveled to the club in several cars. McFann rode with E.S. in her car, Bostwick rode with Scott in his car, Walton's friends rode in another car, and Walton rode with Mireles in his rented Taurus. On the way to the bar, Mireles drove by the motel and restaurant and mentioned to Walton that he worked at the restaurant and stayed at the motel.

The group arrived at the bar sometime between 10 and 11 p.m. Though there was a $5 cover charge to get into the bar, Mireles took it upon himself to pay for everyone's cover charge. When the group got inside the club, they sat down at a booth. McFann estimated that there were 80 to 90 people inside the bar. Walton said there was a "[m]oderate amount of people" inside the bar. Members of the group proceeded to drink, socialize, dance, and play pool. Mireles bought drinks for everyone in the group.

When they first arrived at the bar, Walton sat next to Mireles in the booth and the two of them talked exclusively to one another.

Walton and Mireles eventually kissed. But as the night progressed, Walton's interest in Mireles declined due to him constantly asking her to accompany him to his motel room and after seeing him kiss E.S. McFann, who also saw E.S. and Mireles kiss, said that E.S. became interested in Mireles while at the club. After seeing Mireles kiss E.S., Walton left the bar with her friends at approximately midnight. Before leaving, Walton noted that E.S. appeared to be happy but intoxicated.

E.S.'s older brother, Jacob, arrived at the bar at 11:45 p.m. and met E.S. inside the bar. Jacob said that E.S. was intoxicated when he saw her. E.S. introduced Jacob to Mireles. Jacob said that it appeared that E.S. was "with" Mireles. While at the bar, Jacob said that E.S. danced, drank, and talked to her friends and to people that Jacob did not know. Jacob stayed at the bar for 30 to 45 minutes and eventually left the bar at 12:45 a.m. He said that E.S. was still at the bar when he left.

According to McFann, E.S. and Mireles became intoxicated while at the bar. They appeared to be happy and having a good time. McFann also said that as the evening progressed, Mireles became more persistent in asking the girls in the group to come to his motel room to party and even asked McFann about acquiring some cocaine.

While McFann was on the dance floor, E.S. approached her and told her that she was leaving the bar with Mireles. McFann tried to convince E.S. not to leave, but E.S. would not listen to her. A bouncer working at the bar that night saw E.S. leave the bar with Mireles. According to the bouncer, E.S. told him that she would be back. The bouncer said that E.S. appeared to be happy and not distressed.

Aurelia Resa, a high school classmate of E.S., came to the bar that evening and briefly spoke with E.S. at about the time she was getting ready to leave the bar. E.S. told Resa that she would return to the bar. Resa saw E.S. leave the bar with a man that Resa had never seen before. Resa asked the bartender about the man, and the bartender told her the man worked at the Italian restaurant.

McFann eventually left the bar with a friend who drove her to E.S.'s apartment. McFann knocked on the apartment door but no

one answered. Resa called E.S. on her cellphone before leaving the bar, but E.S. did not answer her phone. Later, Resa tried calling E.S. a second time with still no answer.

At 4 a.m. on Saturday, November 24, Mireles called his girlfriend, Martens, and told her that "something" had happened and that he was on his way to Baxter Springs. He explained that he had "hurt a guy" at the motel and that he had blood on himself. Martens said that Mireles sounded scared and worried over the phone.

Mireles arrived at Martens' grandmother's house at about 8 a.m. Martens saw that Mireles had blood on his arm and on a white tank top he was wearing. The blood on the tank top looked like Mireles had smeared it onto his tank top with his arm. Martens also noticed that Mireles' knuckles were "busted up" and that he had a small cut on his shoulder. Mireles came into the house, and Martens directed him into the bathroom where he cleaned the blood off of himself. Martens gave Mireles a new shirt to wear.

In explaining what happened to him, Mireles told Martens that he had met a couple at the bar and invited them back to the motel room for drinks after the bar closed. Mireles said that when they got back to the room, the man started "pushing the girl" on him, i.e., offering the girl to Mireles for sex. Mireles refused, leading to a fight between Mireles and the man. As they were fighting, the girl left the room. The guy eventually pulled a knife on Mireles, but Mireles used a toilet plunger to defend himself. Mireles beat up the man, injuring the man badly and causing him to lose a lot of blood. Mireles told Martens that he got scared at this point and quickly gathered up the rest of their possessions and left. Mireles claimed that the man was still alive when he left the room.

After cleaning himself off, Mireles ate and then went to sleep. While Mireles slept, Martens left the house to visit a relative.

Just before noon on Saturday morning, Patel, the owner of the El Dorado Motel, was doing a routine check of the motel grounds when he noticed that a window and screen to Room 21 (Mireles and Martens' room) were broken. The screen had about a 16-inch rip or cut in it and there was some glass on the sidewalk below the window. After knocking on Room 21's door and getting no response, Patel unlocked the door with his master key and opened

the door. When he walked into the room, he saw a large amount of blood on the carpet and on the mattress. He left the room and walked over to the Italian restaurant to tell Terzui about the condition of Mireles' room. Terzui accompanied Patel back to Room 21 and examined the room. After seeing the blood, Terzui told Patel that he should contact the police. Patel did so, and law enforcement eventually arrived at the motel and began examining the room. Law enforcement found large blood stains on the carpet and on the bed. Enough blood was spilled on the bed that the blood actually soaked through the sheets and into the mattress. Law enforcement also found "cast off" blood stains on the ceiling and wall near the bed and found a toilet plunger in the room that appeared to have dried blood on its handle.

Underneath the bed, law enforcement found a black brassier and a white t-shirt with wording on the front that said "Everything is Bigger in Texas." Jacob and McFann later identified this shirt as the one E.S. was wearing on Friday night. Law enforcement also found four beer bottles in the room which they collected for DNA testing. Finally, law enforcement noted that the room's bedspread was missing.

On Saturday afternoon, Nathan Baker, E.S.'s roommate, received a phone call from Resa telling him that she was concerned for E.S. because she had left the bar with a guy named Israel who worked at the Italian restaurant. Resa said that E.S. had told her that she would be returning to the bar but never did. Resa said that she tried calling E.S. but was unable to get a hold of her. Finally, Resa told Baker that she drove by the bar's parking lot and saw that E.S.'s car was still parked in the lot.

After speaking with Resa, Baker drove to the restaurant to see whether E.S. was with Israel or to ask Israel whether he knew where E.S. was at. When Baker arrived there, he saw that police were already at the scene. Baker later went to the police station and filled out a statement conveying the information about E.S. that Resa had relayed to him.

In Baxter Springs that afternoon, Martens returned to her grandmother's home after visiting with a relative. Shortly thereafter, she left Baxter Springs with Mireles in the rented Taurus. Martens said

that when she first got into the car, she smelled bleach and saw blood on the steering wheel. The couple drove to Vernon, Texas, where Mireles' mother lived. They stayed in Vernon for about an hour before leaving for Mexico. The couple ultimately succeeded in crossing the border into Mexico.

After law enforcement confirmed that Room 21 was rented to Mireles and Martens, a KBI agent traveled to Martens' grandmother's house in Baxter Springs to check on Martens' well-being. The agent arrived at the residence on Saturday at 10:30 p.m. and spoke with Martens' mother and grandmother. The agent learned that Martens had been at the residence from Thanksgiving until that day when she left with Mireles.

Law enforcement searched the residence's dumpster and found a white blouse that appeared to have a blood stain on it, a set of keys, a green handled knife with a green sheath, and a beer bottle. The officers also found a white plastic bag containing jeans, boxer shorts, and socks. The jeans appeared to be damp and had what appeared to be a blood stain on the crotch and thigh area. Law enforcement collected each of the items found in the dumpster and ultimately transported the items to the KBI lab in Great Bend.

On November 27, 2007, law enforcement in Vernon, Texas, found the rented Ford Taurus parked near a Best Western hotel. The vehicle was seized, and law enforcement from Kansas transported the vehicle from Vernon to the KBI lab in Great Bend.

On November 29, 2007, law enforcement found E.S.'s body lying near an embankment off of Highway 54 in Woodson County, Kansas, just south of the town of Toronto. Other than a sock on her left foot, E.S.'s body was naked. She had a telephone cord tied around neck. The cord was the same type as that found in Mireles' room. Furthermore, law enforcement found a bedspread near E.S.'s body—the same type as furnished in the rooms of the El Dorado Motel.

E.S.'s body was eventually transported to the Sedgwick County Regional Forensic Science Center in Wichita where a sexual assault examination and autopsy were performed on November 30, 2007. Diana Schunn, a sexual assault nurse examiner and sexual assault response team specialist, performed the sexual assault examination

of E.S.'s body. Schunn collected forensic evidence from E.S.'s body—specifically, hair samples and swabs of E.S.'s mouth, vagina, cervix, and anus.

During her examination, Schunn observed trauma to E.S.'s vagina, specifically, an injury to the right posterior fourchette. Schunn described the injury as an "[a]ssault trauma measuring a little over 5 millimeters" caused by "blunt trauma" where the tissue exceeded its capacity "to stretch and accommodate any more pressure applied to that tissue." Schunn said that a laceration to the posterior fourchette was not an uncommon injury in a sexual assault case. Schunn also observed a "penetrating trauma" to E.S.'s cervix and the posterior of her uterus. Schunn said that the injury was consistent with a stab wound caused by a knife and that sexual intercourse would not have caused such an injury.

Schunn also observed several lacerations to E.S.'s anus resulting from "blunt penetrating trauma." Schunn said that a handle of a toilet plunger could have caused the injuries to E.S.'s anus.

After Schunn was finished with her examination, Dr. Jamie Oeberst, the district coroner for Sedgwick County and the chief medical examiner at the Sedgwick County Regional Forensic Science Center, performed an autopsy on E.S.'s body. Like Schunn, Oeberst examined the interior of E.S.'s vagina and noticed that E.S. had suffered stab wounds just posterior to her cervix. Oeberst said that these injuries were caused by a knife traveling up the vaginal opening. She also observed the blunt force trauma to E.S.'s anus. Oeberst noted that E.S.'s rectum was extensively bruised and that she had multiple deep injuries to her anus, rectum, and colon. Oeberst said that these injuries were consistent with someone inserting the handle of a plunger into E.S.'s anus.

Oeberst noted that E.S. had semicircular purple and red contusions on her shoulder and chest measuring between 2 and 2\%16 inches in diameter. Oeberst said that the bottom of a beer bottle could have caused the contusions. Law enforcement measured the base of a beer bottle found in the motel room and determined that the diameter of the base was consistent with the size of the contusions. Oeberst also observed bruises on the top of E.S.'s hands, indicating blunt trauma and consistent with defense-type injuries.

Oeberst observed two stab entrance wounds to the left side of E.S.'s chest measuring 1½ inches long and ⅝ to ⁹⁄₁₆ of an inch wide. Though there were only two stab wounds, Oeberst found four perforations to the front of E.S.'s chest wall. In explaining how there could be four perforations to the chest wall when there were only two stab wounds visible on the outside of E.S.'s chest, Oeberst stated: "[I]t could be that the knife was pulled back and then pushed back in through the chest in a different location. Or the ribs are bone, so there may have been—had to be an adjustment of the path of the knife to get around some of the bone that is present in the chest wall." Oeberst noted that when E.S. was stabbed, her heart, aorta, esophagus, and the back of her chest wall were perforated and that the injuries were consistent with being caused by a knife.

Oeberst also found evidence that E.S. had been strangled with the telephone cord found wrapped around her neck. Specifically, Oeberst observed ligature furrows on the outside of E.S.'s neck and the soft tissues and muscles in E.S.'s neck showed signs of hemorrhage. Oeberst also discovered that the hyoid bone—a small bone that sits on the larynx—was fractured.

Oeberst observed multiple injuries to E.S.'s head and face, indicating that she sustained multiple blows. Oeberst said that the muscles on the left side of E.S.'s face near her jaw line were "macerated by blunt trauma" and that the left side of her face was swollen. Oeberst observed a laceration to the right side of E.S.'s forehead and two lacerations to E.S.'s scalp—one above her right ear and the other to the back right of her head. Oeberst said that these injuries were consistent with "blunt impact trauma blows to the head." Oeberst said that the lacerations on E.S.'s face and scalp would have caused significant bleeding.

Oeberst looked at the internal injuries to E.S.'s head and found a small amount of subdural arachnoid hemorrhage in the left temporal lobe and found a contusion to the temporal lobe portion of the brain. Oeberst also found evidence of some brain swelling. Oeberst said that blunt trauma to the head resulting in a cerebral contusion could lead to unconsciousness.

Oeberst said that E.S. was alive when she received the injuries to her head, face, vagina, and anus and that she was alive when she was strangled and stabbed. When asked what her medical opinion was regarding the cause of E.S.'s death, Oeberst said: "Stab wounds of the chest, with ligature strangulation, blunt injury of the head, blunt force of the—perforation of the anus, stab wounds of the vagina that contributed to her causes of death." Oeberst said that the manner of death was homicide.

Mireles was eventually arrested in Mexico and transported to Butler County where he was charged with capital murder in violation of K.S.A. 21-3439(a)(4) (the intentional and premeditated killing of the victim in the commission of or subsequent to committing aggravated criminal sodomy upon the victim), rape in violation of K.S.A. 21-3502, and aggravated criminal sodomy in violation of K.S.A. 21-3506. After he was in custody, law enforcement took a sample of Mireles' DNA as well as prints of his palms and fingers.

Mireles' DNA was found on a swab taken from E.S.'s vagina. DNA testing was also performed on several items taken from Mireles' motel room. Mireles' DNA was found on the mouths of two beer bottles. E.S.'s DNA was found on a (1) window screen, (2) in blood found on the arm of a chair, (3) in blood found on the carpet, (4) on the handle of the toilet plunger, (5) on a beer bottle found on the bed, and (6) on a cutting of the mattress pad. Her fingerprint was found on one of the bottles recovered from the room.

With regard to the items found in the trash dumpster in Baxter Springs, E.S.'s and Mireles' DNA was found on the pair of men's boxer shorts. E.S.'s DNA was found on the knife, and Mireles' DNA was found on the sheath. Three blood stains were found on the pair of jeans recovered from the dumpster. All three stains matched E.S.'s DNA. Finally, law enforcement determined that the set of keys recovered from the dumpster belonged to E.S. based on law enforcement using the keys to unlock E.S.'s apartment door and to unlock her car and to start the vehicle.

The Ford Taurus was examined, and blood was found on the turn signal, on the steering wheel, and in the trunk of the car. Testing showed the presence of E.S.'s and Mireles' DNA on the

turn signal. E.S.'s DNA was found on the steering wheel and in the trunk of the car.

Mireles' case proceeded to trial where the above facts were presented to a jury. Mireles testified at trial, agreeing that he had met E.S. and the other members of her group at the Beijing Restaurant, where they stayed until going to the Retreat. While at the Retreat, Mireles said that his attention turned away from Walton and more towards E.S. He said that E.S. was more outgoing and fun, and he thought that he had more in common with her. Mireles said that they talked, drank, played pool, met people, and eventually kissed. Mireles said that he had quite a bit to drink that night and that everyone in the group was drunk.

Mireles said that he had proposed to the group the idea of everyone going back to his motel for an after party. Mireles also said that he asked the group if anyone knew where they could get some cocaine. He said that McFann told him she knew where they could acquire some cocaine, but that they would get it later, which Mireles took to mean after they left the bar.

Mireles said that sometime between 11:30 p.m. and midnight, E.S. left the bar to retrieve something from her car. Mireles followed her outside. They eventually got into the backseat of his rental car—parked outside the bar—and had sex. Despite both of them intending on returning to the club, Mireles said that after they had sex, they spontaneously decided to go to his motel room. Accordingly, Mireles drove the short distance to the motel.

When they arrived at the motel, they went into Mireles' room and sat on the bed. They talked for a while, drank beer, and eventually had sex again. After they had sex, they decided to go back to the Retreat. After they got dressed, but before they departed for the bar, Mireles heard a knock on the door. Mireles opened the door and saw a man standing before him. The man told Mireles that he had heard they were looking for dope. Mireles turned and looked at E.S. and she told him that the man was "cool," meaning she knew the man. The man then asked Mireles how much he was looking to buy, and Mireles told him he wanted to buy 2 grams. The man told Mireles that it would cost $200. Mireles pulled his money out and asked the man for the drugs. The man said he would

have to go get the drugs. Mireles responded by telling the man that he would not get the money if he did not have the drugs with him.

Mireles eventually told the man he was not interested and put his money back into his wallet. As he was doing so, the man reached for the wallet. Mireles reacted by trying to shut the door, but the man pushed the door open. Mireles and the man exchanged punches and then began to wrestle. They struggled with each other for a couple of minutes before they eventually broke apart. At that point, Mireles told the man that he did not plan to have any trouble and did not want to have anything else to do with him. According to Mireles, he turned and walked out of his motel room, leaving E.S. and the man still inside the room. Mireles said he walked to his car and went for a drive in order to cool off. He returned to the motel about an hour later.

When he got back to the motel, Mireles parked in front of the door to his room and went inside. Mireles said that the first thing he saw was blood and then saw E.S.'s body. He described the scene as a "big mess." Mireles said he became scared and panicked. He began to quickly pack his and Martens' clothes—making six or seven trips between the room and car—and putting the clothes in the backseat of the car. After he finished packing the clothes, Mireles wrapped E.S.'s body in a blanket and put her body in the trunk of the car. Mireles also found his knife on the floor of the room— the same knife law enforcement found inside the dumpster in Baxter Springs. Mireles picked up the knife, put it in its sheath, and placed it inside his car.

After he got everything packed, he got into the rental car and started traveling towards Baxter Springs. When asked why he did not call the police after finding E.S.'s body in his motel room, Mireles explained that he was scared and that he figured "the first person they would blame" would be him, considering that he was the last person with E.S. and that she was killed inside his motel room.

Mireles said that on the way to Baxter Springs, he stopped near a bridge on the highway and placed E.S.'s body on the other side of a guardrail. He eventually arrived in Baxter Springs and told

Martens the story about the couple that she testified to at trial. Mireles said that he told Martens this story because he did not want to tell Martens that he had cheated on her with E.S. Mireles was asked about telling Martens that he had defended himself with a toilet plunger against a man armed with a knife. He explained that he told Martens this story because upon returning to the room and finding E.S. dead, he saw the toilet plunger on the floor. He said that he had a feeling that "somebody" had used the plunger "to defend themselves."

Mireles said that shortly after arriving in Baxter Springs, he took a shower and then took the clothes he was wearing and threw them in the dumpster along with his knife, the sheath, and E.S.'s keys. In explaining why he decided to flee to Vernon, Texas, and then Mexico, Mireles said that he needed time to think about things. He said that he felt embarrassed and ashamed about fleeing to Mexico.

Ultimately, the jury rejected Mireles' testimony and found him guilty of capital murder, rape, and aggravated criminal sodomy. Based on *State v. Appleby*, 289 Kan. 1017, Syl. ¶ 7, 221 P.3d 525 (2009) (a count charging capital murder under K.S.A. 21-3439[a][4] is multiplicitous with a count charging the underlying sex crime), the district court set aside Mireles' conviction for aggravated criminal sodomy. The court sentenced Mireles to life imprisonment without the possibility of parole for the capital murder conviction and imposed a consecutive 203-month prison sentence for the rape conviction.

Mireles filed a timely notice of appeal.

## THE ADMISSION OF PHOTOGRAPHS AT TRIAL

On appeal, Mireles argues that the district court committed reversible error when it admitted into evidence several photographs that were taken during the autopsy and sexual assault examination of E.S.'s body. He argues that the prejudicial effect of the photos outweighed their probative value.

"When reviewing the admission of photographic evidence, an appellate court's first step is to determine whether the photographs are relevant. The decision to admit photographs alleged to be overly repetitious, gruesome, or inflammatory,

*i.e.*, prejudicial, is reviewed for an abuse of discretion. [Citations omitted.] The party who challenges that decision bears the burden of showing such abuse. [Citation omitted.] Admission of photographs that are unduly repetitious and cumulative, or that are introduced solely for a prejudicial purpose, constitutes an abuse of discretion, albeit such a finding is rare in a murder case. [Citation omitted.]" *State v. Edwards*, 291 Kan. 532, 549, 243 P.3d 683 (2010).

For purposes of clarity, the photos that Mireles takes issue with will be organized into two groups: photos that were admitted into evidence during the testimony of Dr. Oeberst, the coroner who performed the autopsy of E.S.'s body, and photos that were admitted into evidence during the testimony of Schunn, the nurse who performed the sexual assault examination of E.S.'s body.

A. *State's Exhibits 131, 134, 135, 136, and 141.*

1. *State's Exhibit 131*

State's Exhibit 131 is a photograph showing the lower half of E.S.'s naked body while lying on the examination table. Presumably, the picture was taken for identification purposes because it shows the toe tag attached to the right foot identifying the body as E.S. and a small sign at the foot of the bed which reads "Sedgwick County Regional Forensic Science Center" and states the date of the examination (11-30-07).

Exhibit 131 was admitted at trial with a group of photos that were taken during Oeberst's examination of E.S. When the State moved to admit these photos at trial, defense counsel objected, stating that she was raising

"the same objection as we previously heard with regards to a pretrial motion on these photographs. They have—are the same exhibit identification numbers as the ones that we discussed in the pretrial hearing. *I'm going to raise the same objections on those exhibit numbers that are within the group that* [the prosecutor] *is offering under the same objection of the relevance versus prejudicial value of those photographs.*" (Emphasis added.)

The court overruled defense counsel's objection and admitted State's Exhibits 130 through 148 into evidence. Notably, at the pretrial hearing to determine the admissibility of State's Exhibits 130-148, defense counsel raised objections to State's Exhibits 133, 134, 135, 136, and 141 but failed to raise any objections to State's Exhibit 131. Accordingly, we conclude that because Mireles failed

to raise an objection to State's Exhibit 131 before the district court, he is precluded from challenging the admissibility of the exhibit on appeal. See K.S.A. 60-404; *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012).

### 2. *State's Exhibits 133, 134, 135, and 136*

State's Exhibit 133 is a photo of the two entrance stab wounds that E.S. sustained to the upper left part of her chest. The picture shows the area of E.S.'s body from her upper waist to her neck. State's Exhibit 134 shows the backside of E.S.'s ribcage after it was removed from her body during the autopsy. The picture shows four perforations in the chest wall between the ribs. State's Exhibit 135 is a picture of E.S.'s heart after it was removed from her body during the autopsy. The picture shows a metal prong inserted into the heart to show how the knife perforated the heart. Finally, State's Exhibit 136 is a picture of the back of E.S.'s chest cavity after all the organs were removed. The picture depicts two wounds to this area: a perforation of E.S.'s aorta and a perforation of the back of E.S.'s chest cavity.

At the pretrial hearing, defense counsel argued that State's Exhibits 133-136 were duplicative of each other, causing prejudice to Mireles. Defense counsel specifically argued that State's Exhibit 135 (the photo of the heart with the metal prong inserted in it) was more prejudicial than probative. The State countered this argument by contending that the photos, taken together, showed how the knife entered into E.S.'s body. The State also argued that the photos demonstrated the amount of force the assailant used in stabbing E.S.

The district court ruled that the photos were separate and distinct. The court stated:

"There is an outside view of the torso. There is essentially an inner view of the multiple stab wounds different from the torso. There is a picture of the heart with an instrument inserted to show the path of the stab wound and then there's a view from a totally different angle in the back. These [pictures] seem to be reasonably necessary to explain medical testimony in this case."

Accordingly, the court ruled that the State's Exhibits 133-136 were admissible at trial.

On appeal, Mireles argues that the district court erred in admitting State's Exhibit 133 into evidence because it was cumulative to State's Exhibit 132, a photo showing a close-up view of the two entrance stab wounds to E.S.'s chest. But as shown above, Mireles did not object to State's Exhibit 133 based on it being cumulative to State's Exhibit 132. He argued that State's Exhibit 133 was duplicative of State's Exhibits 134-136. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *State v. McCaslin*, 291 Kan. 697, 707, 245 P.3d 1030 (2011).

Regardless of whether Mireles' argument regarding State's Exhibit 133 is properly before this court, we reject his argument. Although State's Exhibits 132 and 133 depict the same wounds, State's Exhibit 132 is a close-up view of the wounds, showing the size of the wounds, and State's Exhibit 133 is a more distant view, allowing an observer to recognize where the wounds were located on E.S.'s body. Accordingly, we conclude that the two pictures are not repetitious of each other because each was taken from a different view for the purpose of portraying a different aspect of the wounds. See *State v. Altum*, 262 Kan. 733, 744, 941 P.2d 1348 (1997) ("All five autopsy photographs show the child's head, but there are three distinctly different depictions . . . . Because there is probative value in each view, there is no undue repetition."). We find no abuse of discretion in admitting State's Exhibit 133 into evidence.

With regard to State's Exhibits 134-136, Mireles argues that "[b]ecause the cause and mechanism of death were not in issue in this case, the admission of these photographs which depicted the gruesome results of the autopsy, rather than the results of criminal activity, constituted an abuse of discretion."

In *State v. Hickles*, 261 Kan. 74, 85, 929 P.2d 141 (1996), this court held:

"Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. [Citations omitted.] Photographs

depicting the extent, nature, and number of wounds inflicted are generally relevant in a first-degree murder case."

Furthermore, we recently stated:

"Although they may sometimes be gruesome, autopsy photographs that assist a pathologist in explaining the cause of death are relevant and admissible. [Citations omitted.] However, admitting gruesome photographs simply to ' "inflame the minds of the members of the jury" ' is error. [Citation omitted.] We have also often said that admission of unduly repetitious photographs can constitute an abuse of discretion. [Citation omitted.] The key, as with prejudice, is the word unduly. [Citation omitted.] The admission of photographs in a murder case has rarely been held to be an abuse of discretion. [Citation omitted.]" *State v. Rodriguez*, 295 Kan. 1146, 1157, 289 P.3d 85 (2012).

Although State's Exhibits 134-136 are undeniably gruesome, the three pictures assisted Oeberst in explaining to the jury the nature and extent of the stab wounds to E.S.'s chest. At trial, Oeberst used State's Exhibit 134 to explain how there could be four perforations to the chest wall when only two stab wounds were visible on the outside of E.S.'s chest. She used State's Exhibit 135 to show how E.S.'s heart was perforated. And she used State's Exhibit 136 to depict the perforations that E.S. suffered to her aorta and to the back of her chest cavity. Additionally, we find that the photos clearly depicted the nature and extent of the stab wounds. Thus, the photos were relevant to establishing that E.S.'s murder was intentional and done with premeditation—two issues that defense counsel refused to stipulate to at the pretrial hearing. Accordingly, we conclude that the district court did not abuse its discretion in admitting State's Exhibits 134-136 into evidence at trial.

### 3. *State's Exhibit 141*

State's Exhibit 141 is a photo of E.S.'s head turned towards her left shoulder exposing the right side of her face. The photo shows extensive bruising to the right side of E.S.'s face between her cheekbone and forehead. The photo also shows that E.S. sustained a significant laceration to her right eyebrow.

During the pretrial hearing, defense counsel objected to State's Exhibit 141, arguing that it was duplicative of State's Exhibit 139 and that the photos together were more prejudicial than probative. State's Exhibit 139 shows E.S.'s head facing forward. The angle

depicted in photo allows a viewer to see the left side of E.S.'s face, which is significantly swollen. The photo also shows a laceration near E.S.'s left cheekbone. Notably, the injuries to the left side of E.S.'s face cannot be seen in State's Exhibit 141.

In overruling defense counsel's objection to State's Exhibit 141, the district court ruled that the photos showed

"separate and distinct angles of the face of the decedent in this case. And the Court does not find these are repetitive or duplicative of the same thing. Clearly State's Exhibit marked as 141 does show separate and independent things from 139 regarding the condition of the face. The Court is inclined to deny any objection to either one of these photographs and the State would be allowed to present both 139 and 141."

On appeal, Mireles argues that State's Exhibit 141 is repetitious to State's Exhibit 139 because "Exhibit 139 shows all the injuries that Exhibit 141 shows." We presume that by making this argument, Mireles is referring to the injuries to the right side of E.S.'s face. These injuries are generally depicted in the both photos. But as already noted, the injuries to the left side of E.S.'s face—shown in State's Exhibit 139—are not depicted in State's Exhibit 141. Thus, we conclude that the two photos are not repetitious. Furthermore, Oeberst testified about the different injuries that E.S. suffered to each side of her face, so the photos would have helped the jury in understanding Oeberst's testimony. Thus, we conclude that the district court did not abuse its discretion in admitting State's Exhibit 141 into evidence.

B. *State's Exhibit 153-165.*

1. *State's Exhibit 154-163 and 165*

Defense counsel objected to State's Exhibits 154 through 163—photos taken with a colposcope showing individual lacerations to E.S.'s anus. Defense counsel argued that

"the cumulative nature of these autopsy photographs rises to the level of prejudice versus probative value. I also note for the Court that there has been a collage, I believe, of all of these, which is a separate exhibit that the State intends to produce at trial. I haven't seen it yet. I don't think that it's prepared yet. But I certainly would object to all of these photographs individually and then a collage of the same photographs being shown again to the jury.

"I believe that is certainly more prejudicial than probative. I believe it potentially creates some issues with jury passion, biases. So based on that, I'm objecting to all of these photographs."

The "collage" that defense counsel referred to was State's Exhibit 165, an enlarged photo of E.S.'s anus—taken while it was being spread apart—showing the trauma it sustained. The State added arrows to the photo which pointed to the individual lacerations—depicted in State's Exhibits 154-163—that were suffered. Each arrow was labeled with the corresponding exhibit number (154 through 163) showing where that specific laceration was located.

The district court postponed ruling on the admissibility of State's Exhibits 154-163 and 165 until it could hear testimony from Schunn stating whether each photo contained relevant information concerning the injuries to E.S. At a hearing before the start of the fourth day of Mireles' jury trial, the district court heard testimony from Schunn. Schunn stated that State's Exhibits 154-163 were colposcope photographs that she had taken of individual injuries to the E.S.'s anus. The pictures were taken with a 35 millimeter colposcope at 15x magnification. She said that each injury depicted in State's Exhibits 154-163 identified an injury caused by blunt penetration. Schunn stated that State's Exhibit 165 was an enlarged photograph and showed the location of each injury depicted in State's Exhibits 154-163. She said that with Exhibit 165, she could point out where all the areas of injury to the anus were located but would not be able to detail the specific injury without the colposcope photos depicted in State's Exhibits 154-163.

The district court specifically asked Schunn if there were separate and individual purposes for State's Exhibits 154-163. Schunn answered:

"Each individual photograph—the collage [State's Exhibit 165] is explaining the overall view of the anus and each individual photograph is numbered and identifies the specific area. The colposcope takes picture [*sic*] the size of a quarter. A very small area, so that I could focus in on a given area of the anatomy. Each separate . . . photo details the specific injury that helps identify the penetrating trauma to each of those particular areas.

"So it would be the overall view that you see there shows generals. But each specific photo shows the individual identified trauma and I only have chosen the

itself [*sic*] trauma that is the most significant trauma. There is additional trauma. There is smaller trauma. I'm not even choosing any of those photographs, just because I tried to focus on the larger area of trauma.

"The Court: Well, you stated a larger view, panoramic, for lack of a better term, shows generally the injury, but not specifically. Why can't you just use this view right here [State's Exhibit 165] and explain all the injuries?

"[Schunn]: Because it shows again some of the injuries as to where the location is, but does not show the specificity and the detail to the particular injuries as I'm doing separately in each of those areas and then focusing just on that specific injury in each of the individual photos.

"This [State's Exhibit 165] is an overall, taking the big picture removing the spokes, to be able to see each of the individual injuries. It does an adequate job of being able to show where on the body an orientation from that standpoint. The individual photo shows detail of each specific injury.

"[The Court]: Are you saying each of those photos, which you said you were familiar with, are necessary to fully explain your testimony before the jury?

"[Schunn]: Each individual—yes. Allow me the detail the different injuries that I have identified in this case."

After Schunn finished testifying about the exhibits, the court ruled that the exhibits were admissible. The court noted that the extent, nature, and number of wounds inflicted are generally relevant in murder cases. It also noted that the State has the burden of proving all the elements of the crime charged. It found that the photographs established the violent nature of the crime and the manner in which E.S. was sodomized. The court also stated that after having heard the testimony of Schunn, it determined that there was "a legitimate purpose to each of the photos objected to" and that they were "not being offered merely to inflame the minds of the jury." It also found that the photographs would help to explain and supplement Schunn's testimony.

During Schunn's trial testimony, the State moved to admit State's Exhibits 154-163. Defense counsel objected "based on the cumulative nature and unduly prejudicial nature" of the exhibits. The district court overruled the objection and admitted the exhibits into evidence. With regard to State's Exhibit 165, Schunn stated at trial that she created the collage to be able to accurately identify where the specific injuries (shown in State's Exhibits 154-163) were located. When asked how Exhibit 165 would assist the jury in understanding her testimony, Schunn stated:

"Exhibit 165 is a photograph that I took with the 35 millimeter camera to allow me to take a wider view of all of the anal area and does give a general overview of the anal injuries that I identified when I first sat down to see the general—or the anal area. Then specifically I have labeled each of those areas to help with orientation, so that when we look at a colposcope photo, as I said, this area of injury at you know, four o'clock. Then I can show with the diagram where I have labeled the different area with an arrow specifically that the area that we are looking at the injury and then specifically see the detail of the trauma and injury with the colposcope photo."

After this explanation from Schunn, the prosecutor moved to admit Exhibit 165. In response, defense counsel said that she had no objection to Exhibit 165 for demonstrative purposes only. The district court admitted Exhibit 165 into evidence. Accordingly, we conclude that Mireles waived any objection he may have had to State's Exhibit 165.

On appeal, Mireles argues that the injuries depicted in State's Exhibits 154-163 were cumulative of one another and the injuries depicted in the photos were enlarged and, thus, unduly prejudicial.

Based on Schunn's testimony, State's Exhibits 154-163 showed distinct and separate injuries to E.S.'s anus caused by blunt penetrating trauma. Schunn used these exhibits, along with State's Exhibit 165, to explain each injury she observed to E.S.'s anus. Accordingly, the pictures were not cumulative and were clearly relevant to establishing that E.S., prior to her death, was repeatedly and violently sodomized—a central element to the theory of capital murder the State charged against Mireles. See *State v. Appleby*, 289 Kan. 1017, Syl. ¶ 7, 221 P.3d 525 (2009) ("When capital murder is charged under K.S.A. 21-3439[a][4], the State must prove beyond a reasonable doubt that the defendant intentionally and with premeditation killed a victim in the commission of, or subsequent to, the commission of one of the sex crimes listed in the statute . . . ."); *Hickles*, 261 Kan. at 85 (photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible). The district court did not abuse its discretion in admitting State's Exhibits 154-163 into evidence.

### 2. *State's Exhibits 153 and 164*

State's Exhibits 153 and 164 were colposcope photos that Schunn took of E.S.'s right posterior fourchette and cervix, respectively. State's Exhibit 153 was admitted into evidence with State's Exhibits 154-163. Defense counsel lodged the same objection to 153 as she did to other exhibits contained in the group, *i.e.*, that the exhibits were cumulative and unduly prejudicial. With regard to State's Exhibit 164, defense counsel objected to the exhibit based on it being unduly prejudicial. The district court overruled both objections. On appeal, Mireles does not expand on his basis for these objections.

Both of the exhibits were properly admitted. They depicted different injuries that E.S. sustained to the interior of her vagina and assisted Schunn with describing these injuries to the jury. In her trial testimony, Schunn used State's Exhibit 153 to describe the injury to E.S.'s right posterior fourchette as an "[a]ssault trauma measuring a little over 5 millimeters." As noted above, she said the injury was a laceration caused by "blunt trauma" where the tissue exceeded its "capacity to stretch and accommodate any more pressure applied to that tissue." Schunn said a laceration to the posterior fourchette is a common injury in a sexual assault case. Furthermore, Schunn stated that State's Exhibit 164 depicted a stab wound to E.S.'s cervix caused by a knife. Schunn said that the same wound depicted in State's Exhibit 164 extended into the backside of E.S.'s uterus. Schunn said that ordinary sexual intercourse would not have caused this wound.

The photos were clearly relevant to establishing that E.S. was raped, a crime Mireles was charged with committing. See K.S.A. 21-3501(1) (defining sexual intercourse as "any penetration of the female sex organ by a finger, the male sex organ or any object"); K.S.A. 21-3502(a)(1) (defining rape in general as sexual intercourse with a person who does not consent). Thus, we conclude that the district court acted well within its discretion in admitting State's Exhibits 153 and 164 into evidence at Mireles' trial.

### FELONY-MURDER INSTRUCTION

Next, Mireles argues that the district court erred when it failed

to instruct the jury on felony murder as a lesser included offense of capital murder. Notably, Mireles failed to request a felony-murder instruction.

K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included offense instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. Consequently, if an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court.

This court recently stated in *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012), that

"[t]o determine whether an instruction or a failure to give an instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record."

If the reviewing court determines that the district erred in failing to give the instruction at issue, then the court proceeds with a reversibility inquiry "wherein the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5.

Here, a felony-murder instruction would have been legally appropriate. We recently held that because capital murder is

"the highest degree of homicide in Kansas, first-degree murder is a lesser degree of capital murder under K.S.A. 21-3107(2)(a) and is therefore a lesser included crime of capital murder. Because first-degree murder encompasses the two alternative means of premeditated murder and felony murder, felony murder is a lesser included crime of capital murder." *State v. Cheever*, 295 Kan. 229, Syl. ¶ 11, 284 P.3d 1007 (2012), *cert. granted in part on other grounds* 134 S.Ct. 41 (2013).

Furthermore, based on the way the State charged Mireles with capital murder in this case, felony murder would also qualify as a lesser included crime of capital murder under K.S.A. 21-3107(2)(b) ("A lesser included crime is . . . a crime where all elements of the lesser crime are identical to some of the elements of the crime charged."). The State charged Mireles with capital murder under K.S.A. 21-3439(a)(4), which defines capital murder as the

"intentional and premeditated killing of the victim of one of the following crimes in the commission of, or subsequent to, such crime: Rape, as defined in K.S.A. 21-3502 and amendments thereto, criminal sodomy, as defined in subsections (a)(2) or (a)(3) of K.S.A. 21-3505 and amendments thereto or aggravated criminal sodomy, as defined in K.S.A. 21-3506 and amendments thereto, or any attempt thereof, as defined in K.S.A. 21-3301 and amendments thereto."

In comparison, K.S.A. 21-3401(b) defines felony murder as the killing of a human being committed in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436. Among the inherently dangerous felonies listed in K.S.A. 21-3436 is rape and aggravated criminal sodomy. See K.S.A. 21-3436(a)(5), (6). Thus, when the underlying crimes such as rape or aggravated criminal sodomy serve as the basis for charging a defendant with capital murder under K.S.A. 21-3439(a)(4), the crime of felony murder is also implicated because rape and aggravated criminal sodomy are considered inherently dangerous felonies for felony murder purposes. In other words, establishing that a defendant intentionally and with premeditation killed the victim during the commission of or subsequent to committing a rape or aggravated criminal sodomy upon the victim (*i.e.*, a capital murder) would necessarily establish the lesser crime of killing the victim during the commission or flight from the commission of a rape or aggravated criminal sodomy upon the victim (*i.e.*, a felony murder).

As already noted above, the State charged Mireles with capital murder under K.S.A. 21-3439(a)(4) based on the underlying crime of aggravated criminal sodomy. Accordingly, all the elements of felony murder based on committing aggravated criminal sodomy are identical to some of the elements of the capital murder charged

in this case, resulting in a felony-murder instruction being legally appropriate under K.S.A. 21-3107(2)(b).

We now determine whether an instruction on felony murder as a lesser included offense of capital murder would have been factually appropriate. The relevant inquiry is whether there is some evidence upon which a jury could have reasonably convicted the defendant of the lesser crime. *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012); see also *State v. Berry*, 292 Kan. 493, 503, 254 P.3d 1276 (2011) ("Under [K.S.A. 21-3414(3)], the analysis focuses on the evidence supporting the lesser offense, and evidence of the higher offense is considered only in determining whether that evidence would allow a jury to reasonably convict of a lesser included offense."); *Cheever*, 295 Kan. at 259 (noting that felony-murder instruction should be given in capital cases where such an instruction is supported by the facts).

To convict a defendant of felony murder, the State

" 'must prove only that the defendant committed a felony inherently dangerous to human life, which directly resulted in the homicide. [Citation omitted.] Accordingly, a defendant may be convicted of felony murder even if the victim was not killed by the defendant . . . as long as the homicide occurred as a direct result of an inherently dangerous felony. [Citation omitted.]' *State v. Ransom*, 288 Kan. 697, 713-14, 207 P.3d 208 (2009)." *State v. Washington*, 293 Kan. 732, 738-39, 268 P.3d 475 (2012).

As already noted above, all the elements of felony murder are identical to some of the elements of the capital murder charged in this case. In order to convict Mireles of capital murder, the State had to prove that Mireles intentionally and with premeditation killed E.S. during the commission of or subsequent to committing an aggravated sodomy upon her. Establishing this factual showing would have included proving that Mireles committed a felony murder, *i.e.*, he killed E.S. during the commission of or flight from committing an aggravated criminal sodomy upon her. Based on the facts noted above, evidence was presented establishing that Mireles killed E.S. sometime during or after he sodomized her with the handle of a toilet plunger. Thus, an instruction on felony murder as a lesser included offense of capital murder would have been factually appropriate in this case.

We must now determine whether the district court's error in failing to instruct on felony murder as a lesser included offense of capital murder constituted clear error. As mentioned above, in order to constitute clear error, a reviewing court must be firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. *Williams*, 295 Kan. 506, Syl. ¶ 5.

Here, the jury was instructed that in order to convict Mireles of capital murder, it had to find that he *intentionally* and with *premeditation* killed E.S. in the commission of or subsequent to the commission of an aggravated criminal sodomy upon her. Notably, the elements of felony murder do not include a killing that is intentional or done with premeditation. See *State v. Edgar*, 281 Kan. 47, 58, 127 P.3d 1016 (2006). The jury was also instructed on the lesser included offenses of premeditated first-degree murder and second-degree intentional murder. Like felony murder, second-degree intentional murder does not require the killing be premeditated. See K.S.A. 21-3402(a) (second-degree intentional murder).

The evidence presented at trial showed that after E.S. had sustained blunt force trauma to her head, face, and chest, had a knife inserted into her vagina, and had the handle of a toilet plunger inserted into her anus multiple times, she was strangled with a phone cord and stabbed to death. This evidence would establish that E.S.'s death resulted from an intentional, premeditated killing. See *State v. Scaife*, 286 Kan. 614, 617-18, 186 P.3d 755 (2008) ("Premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is a reasonable one."); *State v. Gunby*, 282 Kan. 39, Syl. ¶ 9, 144 P.3d 647 (2006) ("Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct, but it does not have to be present before a fight, quarrel, or struggle begins. Death by manual strangulation can be strong evidence of premeditation."); *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001) ("Premeditation does not have to be present before a fight, quarrel, or struggle begins."); see also *State v. Jones*, 279 Kan. 395, 404, 109 P.3d 1158 (2005) (citing *Scott*, 271 Kan. at 111, for the rationale that the jury could find defendant's "state of mind" changed from acting with intent to acting with premedita-

tion "at any time during the violent episode before he caused the victim's death, including at any time during the strangulation").

The evidence presented at trial clearly established that E.S.'s death was an intentional, premeditated killing and not merely the result of Mireles engaging in an inherently dangerous felony. This conclusion is supported by the jury's refusal to find Mireles guilty of second-degree intentional murder. Like we do, the jury obviously viewed the evidence as establishing premeditation, eliminating the possibility of Mireles being found guilty of not only second-degree murder but felony murder as well. Furthermore, by not finding Mireles guilty of premeditated first-degree murder, the jury concluded that the evidence clearly established that Mireles not only intentionally and with premeditation killed E.S., but also brutally sodomized her prior to her death, qualifying the crime as a capital murder under K.S.A. 21-3439(a)(4). Accordingly, we conclude that even if the jury would have received an instruction on felony murder, the jury would have still convicted Mireles of capital murder. Consequently, the failure of the district court to instruct the jury *sua sponte* on felony murder does not constitute clear error.

## PROSECUTORIAL MISCONDUCT

Finally, Mireles argues that the prosecutor committed misconduct during his closing argument. He contends that the prosecutor improperly expressed a personal opinion about the strength of his case during his closing argument.

"Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. Second, if misconduct is found, an appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial." *State v. Marshall,* 294 Kan. 850, 856, 281 P.3d 1112 (2012).

### A. *The Statement at Issue.*

During his closing argument, the prosecutor stated:

"The Judge read instructions about the lesser included offenses. What those mean and you don't even have to get to the lesser included offenses, if you believe that the State has met its burden of proof and established all elements of capital mur-

der. The element of the intentional premeditated killing during the course of an aggravated sodomy, you have to find him guilty beyond a reasonable doubt to the standards set forth in the jury instruction. If you do not find him guilty of capital murder, you should then consider first degree murder or second degree murder. First degree is simply an intentional premeditated killing. No aggravated sodomy. And second degree murder is simply intentional, but not premeditated. You know, more like the type of situation where somebody is fighting in a bar and pulls a gun and the guns goes [*sic*] off. I have gone through the scene at the motel room. I won't repeat it. *But I do not believe evidence shows a credible version of the evidence to support the lesser included offenses.*

"[Defense counsel]: Objection, Your Honor. Counsel cannot state his personal opinion as part of argument in regards to this. Ask that it be stricken.

"The Court: Given the way that the statement was phrased, counsel, I don't believe that is exactly what happened. There wasn't anything impermissible. Objection is overruled. I would suggest, [prosecutor], please exercise caution in your remarks. You may proceed further.

"[The prosecutor]: As the Court told you, statements of counsel are not evidence in the case. You get to decide. The State has attempted to bring all the credible evidence we could find to the courtroom. We have brought you the evidence from the motel room, evidence from Baxter Springs. The evidence from the car found in Texas. The evidence from the victim's body and what you need. All of the evidence admitted by the Court. All the testimony in the case to base your decision on." (Emphasis added.)

## B. *Analysis.*

In *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006), this court stated:

"Prosecutors must not state a personal opinion regarding the ultimate guilt or innocence of the defendant. The reason for prohibiting prosecutors from commenting on their opinion of the defendant's guilt is that such expressions of personal opinion are a form of unsworn, unchecked testimony, not commentary on the evidence of the case. [Citation omitted.]"

Recently, in *State v. Peppers*, 294 Kan. 377, 399-400, 276 P.3d 148 (2012), this court limited *Corbett's* holding by noting that although a prosecutor must not state a personal opinion regarding the ultimate guilt or innocence of the defendant,

"[i]t is permissible for a prosecutor to argue that the evidence demonstrates a defendant's guilt. For example, in [*State v.*] *Mann*, 274 Kan. [670, 688-89], 56 P.3d 212 [(2002)], we approved of a prosecutor's statement near the beginning of closing argument that '[t]he [S]tate believes that [the victim] was killed with premeditation intentionally, first degree, and this is why,' which led into discussion

of the evidence pointing to guilt. *State v. Bennington*, 293 Kan. 503, 530-31, 264 P.3d 440 (2011) (prosecutor's statement—'That's what he did'—did not exceed wide latitude afforded prosecutor—when the prosecutor 'relating the facts' to elements of crime). It is necessary, however, for a prosecutor to say something akin to 'the evidence shows defendant's guilt' in order to make a statement merely directional and not an expression of the prosecutor's personal opinion."

The comment at issue here came after the prosecutor gave a lengthy discussion of the evidence presented at trial establishing Mireles' guilt for capital murder. After finishing this discussion, the prosecutor essentially stated that he did not believe, based on the evidence he discussed, that the defendant could be found guilty of the lesser included offenses. Accordingly, we construe the prosecutor's statement as being "merely directional and not an expression of the prosecutor's personal opinion." *Peppers*, 294 Kan. at 400.

The comment at issue was within the wide latitude a prosecutor is allowed in discussing the evidence; thus, the comment did not constitute prosecutorial misconduct.

Affirmed.